**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**German Fidel CUETO,**
**Defendant-Appellant.**

No: 78–5746.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1980.

R. Scott Laing, Rivera Beach, Fla., (Court-appointed), for defendant-appellant.

Karen L. Atkinson, Ralph N. Person, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before THORNBERRY, RONEY and TATE, Circuit Judges.

THORNBERRY, Circuit Judge:

German Fidel Cueto appeals his conviction following a jury trial on a one-count indictment for attempted bank robbery under 18 U.S.C. §§ 2, 2113(a) (1976). Cueto seeks a new trial, and contends that the district court committed reversible error in denying his motions (1) for a continuance, (2) to exclude the testimony of a government witness who violated the witness sequestration rule, (3) to suppress evidence obtained at the time of his arrest, and (4) for a mistrial because at trial the government relied upon an improper photographic display to identify Cueto as a participant in the robbery. Because we find that the trial judge erred when he failed to suppress certain evidence and when he allowed the Government to rely upon an improper photographic display, we reverse the appellant's conviction in the court below, and remand the case for a new trial.

### I. Facts.

On May 18, 1978, a teller at a drive-in window at Century National Bank in Boynton Beach, Florida, was confronted by a lone white male in a burgundy and white Chrysler automobile. He placed a canvas bag into the teller's drawer and said, "This is a holdup, give me all your money and don't call the police, I have a bomb." Record at 43. He claimed that he had a detonating device in his hand, and repeated that it was a holdup. Instead of cooperating, the teller dropped to the floor, set off an alarm, and crawled out of the room; the robber drove away. The Boynton Beach police arrived immediately, along with the FBI.

The FBI was investigating a nationwide string of about twenty bank robberies with a similar modus operandi involving a hoax bomb. Once FBI agents obtained a description of this robbery from the teller, they believed that it fit the pattern. They anticipated that the bomb was a hoax, and that the automobile had been stolen and would be abandoned near the bank. They also expected that the robber had an accomplice who would meet him with a second vehicle, and that the two would proceed to a small motel in a nearby town.

The canvas bag left in the teller's window was inspected and found to contain a hoax

bomb made of highway flares. The police soon discovered an abandoned burgundy and white Plymouth Volare behind a Pizza Hut restaurant a block from the bank. The car had been stolen the previous morning from a Delray Beach, Florida, Chrysler-Plymouth dealership. From the odometer reading the FBI calculated that the car had been driven about twenty-two miles between the theft and its discovery at the Pizza Hut. A crumpled slip of paper bearing the toll-free telephone number provided by the Century National Bank for its customers in Boca Raton, Florida, appeared on the ground by the car. FBI agents began a canvass of motels located along the twenty-two mile stretch of highway between Boynton Beach and Boca Raton in an effort to locate the suspected robbery team.

At the Boca Raton Motel FBI agent Heaney spoke with Will Senkowicz, the motel owner. The agent displayed a photograph of a prime suspect in the string of robberies, and Senkowicz thought he recognized the person depicted. The agent then recounted the events at Century National Bank, including the use of a hoax bomb made of flares. Senkowicz recalled that at ten o'clock that morning he had seen a flare in his Dempster Dumpster; the flare had not been there when he had emptied the trash a few hours earlier. The agent inspected the Dumpster and discovered a flare and other materials from which the hoax bomb had been constructed, along with Sears, Roebuck and Company receipts for their purchase. The agent examined the motel registration cards for the prior evening and found one for a Larry Ray, with a New Jersey address; an FBI check revealed that the address was fictitious. The card also contained a license tag number for Ray's automobile. The FBI traced the number to a car registered to the Gold Coast Car Leasing Company in Dania, Florida. At Gold Coast Car Leasing, FBI agent Williamson spoke with Frank Kosiba. Kosiba recalled renting a green Chevrolet Monte Carlo with that license number to Frank Bavosa, who, it later turned out, was the person who actually attempted the robbery. Kosiba had rented vehicles to Bavosa

on several previous occasions. He identified a photograph of Cueto as depicting the man who accompanied Bavosa when he rented the Monte Carlo. Another agent traced the receipts found in the Dumpster to a nearby Sears store, where a sales clerk, Robert Lamar, remembered selling flares identical to those in the hoax bomb to two men whose photographs he identified.

The search for the Monte Carlo ended at the Holiday Beach Hotel in Hollywood Beach, where the car was parked in the hotel lot. The hotel manager recognized a photograph of a suspect and said that the man was a guest, along with Larry Ray, later identified as Frank Bavosa, in room 136. FBI agents surrounded the room. Agent Potter telephoned the room, identified himself, and asked the occupants to open the door. Moments later other agents knocked on the door and identified themselves as the FBI. Either Cueto or Bavosa opened the door slightly and looked out. The agents quickly gained entry and arrested Cueto and Bavosa, the only occupants of the room. The agents handcuffed both suspects and removed them for a while to the next hotel room. The agents observed a number of items in the room, including opened suitcases and clothes. The agents conducted a thorough search of the room and uncovered a hat and shirt like the ones worn by the robber, rolls of tape like that used on the hoax bomb, and various other pieces of evidence.

On August 23, 1978, Cueto was indicted for attempted bank robbery. A federal public defender was appointed to represent him. A possible conflict of interest subsequently arose when Bavosa, who previously had been represented by the federal public defender, pled guilty and agreed to testify for the Government in Cueto's case. In return for Bavosa's cooperation, the Government agreed not to prosecute Bavosa for nineteen other bank robberies in which they suspected that Bavosa and Cueto participated. Bavosa received a ten-year sentence for the Boynton Beach robbery. New counsel, R. Scott Laing, was appointed for Cueto approximately one month prior to trial.

At trial the Government established most of the above facts. Frank Bavosa testified for the Government and thoroughly incriminated Cueto. He related how he and Cueto flew from New Jersey to Florida, planned the robbery of the Century National Bank, and attempted to carry it out. He said that Cueto was with him when he signed the rental agreement for the Chevrolet Monte Carlo, bought the materials for the hoax bomb at Sears, and registered at the Boca Raton Motel and the Holiday Beach Hotel. Bavosa told how Cueto stole the Volare from the Chrysler-Plymouth dealership and later met him behind the Pizza Hut with the getaway car, the Monte Carlo, after Bavosa's aborted robbery attempt. An FBI explosives expert testified that pieces of electrical tape discovered in the Dumpster at the Boca Raton Motel and in room 136 at the Holiday Beach Hotel matched the tape used to construct the hoax bomb.

As a result of his subsequent conviction, Cueto received a ten-year sentence to run consecutively to a ten-year sentence Cueto received in state court for the same bank robbery.

## II. Continuance.

Cueto first contends that the district court erred when it denied the motion for a continuance filed by his substitute defense counsel, Laing, on the day of trial. Laing contended that he had been unable properly to prepare Cueto's defense for several reasons. He claimed that his lack of experience in federal court and lack of access to an adequate law library made it difficult for him to ready Cueto's case for trial. He also claimed that a heavy state court workload had left him little time to meet with Cueto.

During the Thursday morning docket call Laing had an appointment with the dentist and a state court trial later that day. He telephoned his associate Joseph Kuharcik that morning and told Kuharcik to tell two other associates to appear on behalf of Cueto at the docket call. Kuharcik was unable to contact the other two associates; he called the court clerk to tell her that Laing

had a state court case and would be unable to attend docket call. The clerk told Kuharcik that the trial would be at nine o'clock Tuesday morning. Kuharcik replied, "[F]ine, I'll relay the message to Mr. Laing." Record at 31. Laing did not then inform the judge about his need for a continuance until the time for trial, when the Government appeared with several out-of-state witnesses. The judge told Laing that he should have informed the judge earlier about his problems preparing for the trial, and denied Laing's motion for a continuance.

 A motion for continuance is directed to the sound discretion of the trial judge, and his decision will not be disturbed on appeal unless an abuse of that discretion is demonstrated. *See, e. g., United States v. Henderson,* 588 F.2d 157, 159 (5th Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979). In review, we evaluate each situation on a case-by-case basis and normally consider only the reasons for continuance presented to the trial judge. *United States v. Uptain,* 531 F.2d 1281, 1285–86 (5th Cir. 1976). When Laing presented his motion and affidavit to the judge, he failed to specify how any additional time would aid him in his preparation of Cueto's case. *See United States v. Carroll,* 582 F.2d 942, 945 (5th Cir. 1978). After the judge denied his motion Laing made one general allegation that did not appear in his affidavit: "Yesterday, [Cueto] has told me of some witnesses that would be beneficial to his case and that they are from California, and we just won't be able to get them here in time to defend him on this case. And I just think—". Record at 8. The trial was ready to commence, the Government's witnesses were present, and a continuance would have caused considerable inconvenience and expense. Although the facts present a close case, we conclude that the ruling of the trial judge under these eleventh hour circumstances was "a reasonable resolution of the various factors confronting" him. *Uptain,* 531 F.2d at 1291.

We reach this result after a careful examination of a record that indicates that

Cueto was competently and capably represented. Laing demonstrated the skill and preparation expected of defense counsel. He aggressively challenged and impeached the Government's witnesses. He was able to exclude some highly damaging evidence of Cueto's alleged prior acts of bank robbery, and he presented a strong closing argument. He certainly met the sixth amendment standard for effective assistance of counsel. *Carroll*, 582 F.2d at 945.

### III. Sequestration.

Cueto next claims that the judge erred in permitting the FBI case agent, Cavanaugh, to testify. When the trial began, the defense invoked the witness sequestration rule under Fed.R.Evid. 615.[1] Cavanaugh remained in the courtroom and was called by the Government as its third witness. Laing objected to Cavanaugh's testifying because the Government had earlier failed to request that he be excepted from the rule. The judge overruled the objection and said, "He is the representative of the Government . . . the motion will be denied." Record at 56. On appeal, Cueto concedes that the sequestration rule would not have barred Cavanaugh from the courtroom if the Government had initially designated Cavanaugh as its representative under rule 615(2). He contends, however, that the Government's failure to invoke rule 615(2) at the start of the trial rendered Cavanaugh incompetent to testify.

■ In proceedings such as these, a Government's case agent fits the rule 615(2) exception for a party's representative. *United States v. Auten*, 570 F.2d 1284, 1285 (5th Cir.), *cert. denied*, 439 U.S. 899, 99 S.Ct.

264, 58 L.Ed.2d 247 (1978). Although the Government should properly have designated Cavanaugh as the Government's representative at the time the defendant moved to sequester witnesses, we cannot overturn a conviction because of a rule 615 violation unless the objecting party demonstrates substantial prejudice. *United States v. Warren*, 578 F.2d 1058, 1076 (5th Cir. 1978) (en banc). Cueto has made no showing of prejudice. The two witnesses who preceded Cavanaugh to the stand were the bank teller and the Boynton Beach police officer who discovered the abandoned Volare behind the Pizza Hut restaurant. Both of these witnesses testified about events occurring before Cavanaugh came onto the scene and about which Cavanaugh gave no testimony. Cavanaugh's exposure to their testimony resulted in no prejudice to Cueto. For this reason, Cueto's claim of error must fail.

### IV. Illegal Search.

Cueto claims that the judge erred in denying his motion to suppress the evidence obtained from his room at the Holiday Beach Hotel. He rests his argument on the fourth amendment and the federal "knock and announce" statute, 18 U.S.C. § 3109 (1976).[2]

■ The FBI agents entered room 136 without a warrant and, Cueto contends, without probable cause to effect his or Bavosa's arrest or to search the room. With respect to the arrest, Cueto's contention about lack of probable cause has no merit. When the agents prepared to enter, they knew that the name "Larry Ray" used by

---

1. Rule 615 provides:

 At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

2. 18 U.S.C. § 3109 provides:

 The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

 Section 3109 applies to warrantless arrests despite its reference to an officer executing a search warrant. *Sabbath v. United States*, 391 U.S. 585, 588–89, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

the guest in room 136 was the same alias employed at the Boca Raton Motel, where agents had discovered material related to the hoax bomb. The agents also knew that Frank Kosiba at Gold Coast Car Leasing had linked both Cueto and Bavosa to the Monte Carlo they had discovered at the Holiday Beach Hotel. Because probable cause to arrest Cueto and Bavosa was so clear, a warrant was unnecessary. *United States v. Savage,* 564 F.2d 728, 732–33 (5th Cir. 1977).

■ Cueto's 18 U.S.C. § 3109 claim also lacks merit. Because the Government's actions are presumed proper under the statute, a defendant must show some factual basis that a section 3109 violation has occurred. *United States v. Gardner,* 553 F.2d 946, 949 (5th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978). In this case, the evidence indicates that no infraction took place. After the FBI agents surrounded room 136, an agent telephoned its occupants, identified himself, and asked the occupants to come outside. Other agents then knocked on the door, identified themselves, and asked the occupants to open the door. Cueto and Bavosa were arrested when they finally responded. Both Bavosa and Cueto gave testimony corroborating this description of their arrests. The agents complied with both the letter and spirit of section 3109.

After arresting one of the defendants outside the room and the other inside the room, the agents properly seized several items that appeared within plain view on the table and beds in the room. These items included the shirt and hat worn by the robber, some rolls of electric tape, and a Radio Shack bag containing a television picture tube brightener. The warrantless search did not stop, however, at this point. After the agents had arrested, handcuffed, and thoroughly subdued both Bavosa and Cueto, they searched inside Cueto's suitbag and under a mattress. Inside the pocket of a suit in the suitbag the agents found a passport issued in the name of Leon Ernest Royal, Jr., and bearing a photograph of Cueto. The suit pocket also contained a

social security card issued to Royal, a CBS news identification card, and a membership card to the Inner Circle Lounge club. Between the mattress and box spring agents found a plastic business card case with various pieces of identification bearing the name of Leon Royal, including a North Carolina driver's license with Cueto's picture.

■ Warrantless searches incident to an arrest are allowed under *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), for the arrestee's person and the area within his immediate reach. *See also Savage,* 564 F.2d at 732–33 (upholding warrantless search in pockets of shirt folded on closet shelf because the shirt was within the area of the arrestee's immediate reach). The searches inside Cueto's suitbag and between the mattresses were not permissible under *Chimel* because these areas were not shown to be within Cueto's immediate reach. At the time the search was made Cueto and Bavosa were both handcuffed and subdued; the record suggests that they had already been removed from the room. The defendants were certainly in no position to reach concealed weapons or to grab and destroy evidence in the suitbag or between the mattresses. Under these circumstances, the search was improper, and the judge erred in failing to suppress the evidence from inside the suitbag and between the mattresses. *See United States v. Scios,* 191 U.S.App.D.C. 254, 280 n. 15, 590 F.2d 956, 963 n. 15 (D.C.Cir.1978) (en banc) (finding no *Chimel* protection for search made inside room of arrest, but beyond arrestee's area of reach at time of search).

## V. Photographic Display.

Cueto contends that the government's use of a particular photographic identification procedure at trial constituted hearsay and also violated Cueto's due process rights.

At trial the Government attempted to show that Cueto had accompanied Bavosa in various stages of preparation for the robbery by presenting three neutral witnesses who had allegedly seen the two men

together. The first witness, Will Senkow-icz, owned the Boca Raton Motel where the two men allegedly stayed the night before the robbery. He testified that FBI agent Heaney "asked me, he showed me this photograph and asked me if I seen this person before. I looked at it, I said—I told him I'm sorry but I couldn't be very sure about it." Record at 109. Later during direct examination the Government asked Senkowicz to look around the courtroom and to state whether he could identify one of the persons that he had seen around the Boca Raton Motel. Before Senkowicz could answer, defense counsel objected that the issue should be considered outside the jury's presence. The judge sustained the objection. Record at 116. The Government did not make any further attempts to have Senkowicz identify Cueto.

After Senkowicz stepped down, the judge held a bench conference at which he explained that the Government could ask a witness to make an in-court identification after the Government had developed a proper predicate: "So if there is a predicate based upon the fact that he has known this man and he can establish it, certainly he could point him out in the courtroom." Record at 130.

Despite this invitation from the judge, the Government did not ask any other witness except Bavosa to make an in-court identification of Cueto. The second neutral witness, Frank Kosiba, rented the Monte Carlo getaway car to Bavosa, who was accompanied by another man. He testified that he had identified some photographs shown to him by the FBI agents, but he did not indicate the identity of the person photographed. Record at 131, 137. The third neutral witness, Robert Lamar, sold some flares to Bavosa and another man at Sears. He testified that he had identified some photographs shown to him by the agents, but he did not identify the people in the photographs except to describe what they purchased. Record at 150–54.

Each of these three neutral witnesses testified that he had identified a photograph, but none of the witnesses indicated who the photograph depicted. The Government attempted to link the witnesses' statements to Cueto by presenting the testimony of FBI agent Williamson, who had shown the photographs to the witness Kosiba. Agent Williamson testified that he showed two photographs to Kosiba at the car agency. He said that Kosiba correctly identified the person in one photograph as Cueto, but that Kosiba erroneously identified the person in the second photograph, which depicted Bavosa. Record at 157–58. Defense counsel objected and said that this identification was made pursuant to an improper display and constituted hearsay. Record at 158–59. The judge allowed the testimony to stand, and later denied the defendant's motion for a mistrial because of this improper identification testimony. The Government did not present any testimony about who appeared in the photographs that Senkowicz and Lamar had identified.

▇▇▇ The trial judge properly concluded that the identification procedure did not constitute hearsay. A witness's in-court testimony that he had previously identified a photograph is not hearsay because of Fed. R.Evid. 801(d)(1)(C), which excludes such testimony from the definition of hearsay. *See Anderson v. Maggio,* 555 F.2d 447, 449–50 (5th Cir. 1977). An FBI agent's statement that the defendant was the person portrayed in the photograph that the witness identified is also permissible. *United States v. Harden,* 469 F.2d 65 (5th Cir. 1972), *cert. denied,* 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973). The agent's statement corroborating the witness's testimony that he identified the photograph that the agent showed him is not hearsay. *See United States v. Lewis,* 565 F.2d 1248, 1250–52 (2d Cir. 1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978). These authorities are premised, however, on the supposition that the initial photographic display satisfies due process standards.

▇▇▇ The due process standard for reviewing photographic identification procedures constitutes a two-part test. The court must first decide whether the photographic display was impermissibly sugges-

tive. If the court concludes that the display was suggestive, it must then determine whether the procedure creates a substantial likelihood of misidentification. Reliability is the linchpin in determining the admissibility of identification testimony. *Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979); *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

█ In this case agent Williamson showed Kosiba only two photographs: a single photograph of Cueto and a single photograph of Bavosa. The agent did not present Kosiba with an array of similar photographs depicting different individuals. For purposes of identification at trial, the Government's display involving only a single photograph of each defendant in the case is impermissibly suggestive. *See Hudson*, 601 F.2d at 788 ("a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion."). *Compare United States v. Diecidue*, 603 F.2d 535, 565 (5th Cir. 1979) (photographic display of seven different individuals held not suggestive for identification of single defendant).

█ Once we find that a photographic display is impermissibly suggestive, the factors that determine the reliability of the identification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Manson*, 432 U.S. at 114, 97 S.Ct. 2243. The reliability of the photographic identification in this case is very weak, especially with regard to the level of certainty demonstrated by the witness, Kosiba. Kosiba never made an in-court identification of Cueto. In cases such as *Manson* and *Hudson* courts have relied upon clear and positive in-court identifications by the witnesses as an important factor to show the reliability of suggestive photographic displays. In those cases the witnesses were exposed to suggestive displays only before the trial as a means of

preparing for a later in-court identification. In this case the improper photographic display constituted the witness' only identification of the defendant at the trial itself. Even though the trial judge expressly encouraged the Government to use in-court identification once a predicate was established, Kosiba was apparently so uncertain of his identification of Cueto that the Government elected not to have him attempt an in-court identification of the defendant.

█ Kosiba's uncertainty is also revealed by the testimony of agent Williamson, who showed him the photographs. Despite the suggestiveness of the display, Williamson testified that Kosiba correctly identified only one of the two photographs that Williamson showed to him. Kosiba incorrectly identified the photograph of Bavosa, whom Kosiba said he had met on several previous occasions. Record at 136. Unlike the witnesses in *Manson* and *Hudson*, Kosiba gave no detailed description of the defendant and could not otherwise show the accuracy of his identification of Cueto. Because the photographic display was impermissibly suggestive and the witness' testimony does not reveal that his identification of the defendant was otherwise reliable, we conclude that Cueto's due process rights were violated when this evidence was admitted against him.

*VI. Harmless Error.*

The Government contends that any errors resulting from the illegal search or improper photographic display are harmless in light of other evidence adduced at trial. The Government suggests that Bavosa's testimony and Cueto's presence in Bavosa's room at the time of arrest show Cueto's guilt beyond a reasonable doubt according to *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and render harmless the improper evidence and testimony about identification, as in *United States v. Ullrich*, 580 F.2d 765, 773–74 (5th Cir. 1978).

In *Ullrich* a defendant convicted of transporting a stolen vehicle in interstate commerce challenged the in-court identification by a records clerk. The clerk had issued registration papers for the vehicle to the defendant while he was fraudulently using another person's identification. Before identifying the defendant in court, the clerk had picked him out in a lineup that the defendant contended was impermissibly suggestive. We held that any identification error was harmless beyond a reasonable doubt because the testimony of three other witnesses linked the defendant to the stolen car, and because "[c]learly, the evidence overwhelmingly supports the jury's verdict." 580 F.2d at 774.

After a careful review of the record in this case, we cannot conclude that the errors in admitting improper identification testimony were harmless beyond a reasonable doubt. Without the testimony about photographic identification, no other evidence adduced at trial corroborated Bavosa's testimony that Cueto was the person who accompanied him in preparing for the robbery. In contrast to the abundant identification evidence in *Ullrich*, Bavosa's testimony itself hardly provides overwhelming evidence of Cueto's participation in the robbery. We have long held that incriminating testimony by an accomplice, like Bavosa in this case, must be regarded with great suspicion. *See, e. g., Tillery v. United States*, 411 F.2d 644 (5th Cir. 1969) (reversing conviction because judge failed to caution jury against placing too much reliance on accomplice's critical testimony). Bavosa's testimony in this case is particularly suspect because, in return for his guilty plea and testimony against Cueto, the Government agreed not to prosecute him for his suspected role in nineteen other bank robberies. Moreover, on cross-examination Bavosa admitted that he had lied to the FBI about Cueto on at least one occasion; he had first told the agents that he had met Cueto after he arrived in Florida, although later Bavosa claimed that both of them arrived together in Florida. Record at 246.

Cueto's presence in Bavosa's hotel room at the time of the arrest does not erase the doubts about Bavosa's testimony. Cueto was not discovered in possession of any hoax bomb materials nor other evidence related to the bank robbery. Although Bavosa's hat and some rolls of electric tape lying on a table in the room were ultimately linked to the attempted robbery, these items appear innocuous in themselves, and were not otherwise linked to Cueto in any manner. A cigarette lighter wrapped with tape fragments to look like a detonator for the hoax bomb was discovered in Bavosa's shirt pocket. Although the Government admitted that they ran fingerprint checks on the items linked to the hoax bomb and attempted robbery, Record at 278, they introduced no evidence that connected Cueto's fingerprints with these items. *See* Record at 326. In bench conferences before trial the Government repeatedly admitted that identification evidence would be very weak in this case. *See* Record at 16, 20, 68, 85–86, 88–89. In order to show that Cueto was involved in this robbery, the Government tried to introduce testimony about other bank robberies for which Cueto was suspected, but not indicted or convicted. The judge excluded this evidence because it was unsubstantiated and too prejudicial. Record at 91.

Given the questionable credibility of Bavosa's testimony and the absence of other corroborating evidence, we cannot conclude beyond a reasonable doubt that the jury did not rely upon the testimony about photographic identification in reaching their verdict. Although the false identification cards seized in the improper search were probably not as harmful to Cueto as the testimony about photographic identification, this evidence also might have influenced the jury to find Cueto guilty.

Because we find that the judge erred in admitting testimony about improper photographic identification and in admitting evidence obtained in an illegal search, we reverse the appellant's conviction in the court below, and remand the case for a new trial.

REVERSED AND REMANDED.