402 So.2d 1279 (1981)
Michael Jerome JUDD, Appellant,
v.
STATE of Florida, Appellee.
No. 80-167.
District Court of Appeal of Florida, Fourth District.
August 12, 1981.
Rehearing Denied September 23, 1981.
Richard L. Jorandby, Public Defender, and Anthony Calvello, Asst. Public Defender, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Russell S. Bohn, Asst. Atty. Gen., West Palm Beach, for appellee.
HURLEY, Judge.
Michael Judd appeals a robbery conviction and an order revoking probation. He asserts that his trial was fatally tainted by the introduction of evidence of an impermissibly suggestive pre-trial photographic show-up. We agree and, therefore, reverse.
Appellant was charged with robbery. Since the same alleged conduct also constituted the gravamen of a probation revocation charge, he stipulated to a unified trial and probation revocation hearing which resulted in guilty verdicts from the jury and from the judge. Consequently, the trial court revoked his probation and imposed two concurrent sentences of six months to *1280 seven years. From these sentences, Mr. Judd appeals.
Appellant's claim for relief rests upon the trial court's admission into evidence of a photographic show-up and the testimony accompanying it. To understand the significance of this evidence, the factual background of the case must be explored.
On the evening of June 21, 1979, John Shapin was tending bar at his tavern in West Palm Beach. Business was slow and Mr. Shapin was alone watching television. At about 10:30 p.m. he saw three males standing in the tavern's rear doorway. One of the three, dressed in a red shirt and brown pants, stepped inside and spoke briefly with Mr. Shapin. The other two, who were both bare-chested and dressed in shorts or cutoffs, remained near the door. At the conclusion of the conversation, the three males departed together. Mr. Shapin returned to his stool to watch television.
Approximately fifteen minutes later, Mr. Shapin noticed someone running along the outside of the bar. At that point, another person, grabbed him from behind and yanked him off the stool. As Mr. Shapin was pulled backwards to the floor by his unseen assailant, another person came over the bar and knelt over Mr. Shapin, helping to hold him down. Shapin was face to face with this person and later described him as being a black male, about five feet ten inches tall, weighing approximately 180 pounds, bare-chested and well muscled, wearing knee length cut-off shorts. Mr. Shapin remembered that his assailant's hair was braided in several small braids and that his nose was very wide and flat. While pinned, Shapin was relieved of his wallet and the cash register was rifled with approximately one hundred eighteen dollars stolen. After the robbers departed, Mr. Shapin called the police and described the robber he saw as noted above.
Approximately one week later two plainclothes police officers came to the tavern and handed Shapin a stack of seven photographs. They asked him if he could recognize any of the people in them. All of the photographs depicted black males in their late teens or early twenties, but only two were of individuals with braided hair, and only one  the defendant's picture  portrayed a bare-chested individual with braided hair. Shapin immediately selected the defendant.
At trial, Mr. Shapin, over defense counsel's objections, again identified the defendant's picture as portraying the robber who knelt over him. However, Shapin made no in-court identification. Detective Roy Weinbrenner of the West Palm Beach Police Department provided the linking testimony that established that the picture Mr. Shapin selected was that of the defendant, Michael Judd. Mr. Judd presented an alibi defense, which, though not controverted by cross-examination, was obviously disbelieved by the jury.
We begin our analysis by recalling that the United States Supreme Court, in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), cited with approval Wall's Eyewitness Identification in Criminal Cases wherein it was noted that "`[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor  perhaps it is responsible for more such errors than all other factors combined.'" 388 U.S. 218, 229, 87 S.Ct. 1926, 1933. To avoid the hazard of misidentification, the Court fashioned a two-prong test to evaluate allegations of an impermissibly suggestive pre-trial identification procedure. The first step of the inquiry is a factual determination of whether the police employed an unnecessarily suggestive procedure to obtain the out-of-court identification. If the procedure is found to have been too suggestive, the second step is to ask whether, in light of all of the circumstances, there was a substantial likelihood of misidentification. In this respect, a number of factors may be considered. Among them are the opportunity of the witness to observe the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; his degree of certainty at the confrontation; and the *1281 length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Grant v. State, 390 So.2d 341 (Fla. 1980).
With these principles in mind and after careful consideration of all the facts in the instant case, we believe that the pre-trial photographic array was impermissibly suggestive in its singular depiction of Judd as the only person who was both bare-chested and had braided hair. Furthermore, the suggestiveness of the show-up was not vitiated by some other circumstance which would have reduced the `substantial likelihood of misidentification.' Mr. Shapin's observations of his assailant were short-lived and made in a moment of fear and uncertainty. The tavern was dimly lit. Shapin had been working for some twelve hours and had consumed at least two beers earlier in the afternoon. His description of his assailant was very general and though there is an implication that the robbers were the same individuals who had visited the tavern previously, Shapin was never able to state this fact with certainty. Finally, the prosecution made no attempt to have Mr. Shapin make an in-court identification, the clear implication being that he could not do so.
In a recent case, the United States Court of Appeals for the Fifth Circuit dealt with a similar situation when it reversed a conviction of attempted bank robbery based on a suggestive photographic display. The court found that the witness' inability to make an in-court identification was a significant factor which had to be considered in assessing the degree of harm. The court held:
In cases such as Manson and Hudson courts have relied upon clear and positive in-court identifications by the witnesses as an important factor to show the reliability of suggestive photographic displays. In those cases the witnesses were exposed to suggestive displays only before trial as a means of preparing for a later in-court identification. In this case the improper photographic display constituted the witness' only identification of the defendant at the trial itself.
United States v. Cueto, 611 F.2d 1056, 1064 (1980). Like Cueto, the instant case has no in-court identification to bolster the reliability of the suggestive out-of-court identification.
Having reversed the appellant's conviction based on our view that the photographic show-up was impermissibly suggestive and not surrounded by circumstances vouching for its reliability, we also reverse his revocation of probation. Brown v. State, 312 So.2d 528 (Fla. 1st DCA 1975); Plummer v. State, 365 So.2d 1102 (Fla. 1st DCA 1979). The State attempts to distinguish these cases from the one at bar, noting that the revocations involved in them were based on nolo contendere and guilty pleas by the defendants rather than convictions. The Fifth District Court of Appeal, however, states that "if a revocation is based solely on a conviction and that conviction is subsequently reversed, the revocation must also be reversed." Stevens v. State, 397 So.2d 398 (Fla. 5th DCA 1981). In the instant case it is clear appellant's revocation hinged upon his conviction at trial. Indeed, appellant stipulated that the trial was to act as his revocation hearing. Though it is true, as the State has noted by citing Russ v. State, 313 So.2d 758 (Fla. 1975), cert. denied, 423 U.S. 924, 96 S.Ct. 267, 46 L.Ed.2d 250 (1975), that "the ultimate facts necessary to convict for a criminal offense and the ultimate facts necessary to establish a violation of probation are not the same," logic and justice combine in this case to mandate a reversal of the revocation of appellant's probation.
Accordingly, we reverse and remand for a new trial and a new probation revocation hearing.
LETTS, C.J., and HERSEY, J., concur.