**Steven Raheem KADO, Petitioner,**

v.

**Stanley ADAMS, Respondent.**

**No. 96 CV 40449 FL.**

United States District Court,
E.D. Michigan,
Southern Divsion.

Aug. 6, 1997.

Steven Raheem Kado, Ionia, MI, pro se.

K. Davison Hunter, Assistant Attorney General, Habeas Corpus Division, Lansing, MI, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

GADOLA, District Judge.

### I. Introduction

Petitioner, an inmate at the Riverside Correctional Facility in Ionia, Michigan, filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights. Petitioner was convicted by a jury in Oakland County Circuit Court, Pontiac, Michigan on April 9, 1991 of conspiracy to kidnap, kidnapping, conspiracy to commit first degree murder and first degree murder. He was sentenced to 15—25 years for kidnapping and 15 –25 years for conspiracy to kidnap, life imprisonment with the possibility of parole for conspiracy to commit first degree murder and mandatory life imprisonment without parole for first degree murder. Petitioner was also required to pay $6,000 restitution.

After exhausting all appeals in the state courts, Petitioner filed the instant petition, raising the single claim that an impermissibly suggestive photographic identification tainted a subsequent in-court identification, resulting in a denial of due process. For the reasons outlined below, the petition must be denied.

### II. The Identification

The record reveals that on March 31, 1990 at about 7:30 a.m., Rose Marie Kado, Petitioner's ex-wife and a nurse at Beaumont Hospital in Royal Oak, Michigan, was abducted in the Northwood Shopping Center parking lot next to the hospital.[1] Two men were seen forcing her into a yellow station wagon by Gerald Salk, who was at the shopping center to buy newspapers and observed the abduction from 12 feet away. He stated that he heard a commotion, looked up and saw two "possibly Chaldean" men, one outside the station wagon and one in the back seat. He heard the man outside the car tell the woman in a loud, angry voice to "[g]et in the fucking car bitch." Mr. Salk described the woman as wearing a black and white checkered coat, a purple sweater, blue jeans and boots.

Mr. Salk was a reluctant witness. After observing the abduction of Ms. Kado, he went home and told his wife what he had seen. She demanded that he not get involved and they argued over whether or not he should call the police. Mr. Salk learned shortly thereafter, through the media, that a local woman was missing. He saw a picture

---

1. Four days before the abduction, Ms. Kado obtained a judgment of divorce, ending her marriage to Petitioner.

of Ms. Kado in the local newspaper and realized it was the woman whose abduction he had witnessed. The following Saturday, when he again went to Northwood Center to buy newspapers, someone with a flyer approached Mr. Salk and asked if he had seen anything the previous Saturday. Mr. Salk replied that he had, but that he did not want to become involved for fear of reprisal. The man asked Mr. Salk to call police and inform them of what he had seen. Mr. Salk thereafter made an anonymous call to the Royal Oak Police Department and told the officer answering the phone that he saw two men abduct the "missing Kado woman." He refused to give his name.

The following Saturday when Mr. Salk arrived to buy his newspapers, Detective George Johnson of the Royal Oak Police Department approached him and asked him if he was the anonymous caller. Mr. Salk admitted that he was and told Detective Johnson what he observed on March 31, 1990, but refused to give Johnson his name. Detective Johnson asked Mr. Salk to describe the woman he had seen being abducted. Upon hearing Mr. Salk's description, Detective Johnson realized that he had described Ms. Kado, including the clothing she was wearing when she disappeared[2]. Detective Johnson then showed Mr. Salk a photograph of Ms. Kado and Salk confirmed that she was the woman he saw being forced into the car. He related that he had seen her on prior occasions in the drug store at Northwood Center and recognized her because she was attractive.

Detective Johnson then asked Mr. Salk to describe the men. He described the man outside the car as 30—40 years old, dark complexioned, dark hair and wearing working-man type clothes. He described the man inside the car as white (possibly Chaldean) with dark hair, a receding hairline and a brown sportcoat. Because Mr. Salk's description of the man in the back seat fit the

general description of Petitioner, Detective Johnson showed him a photograph of Petitioner and asked if Petitioner looked like the man in the back seat.[3] Mr. Salk stated that Petitioner was the man in the rear seat who had reached out and pulled Ms. Kado into the car. As Mr. Salk left the parking lot, Detective Johnson noted his automobile license plate number. Because Detective Johnson did not believe that Mr. Salk would cooperate, he decided not to initiate a line-up. He testified that he had no idea, at the time he spoke with Mr. Salk at the shopping center, that Ms. Kado was dead. He further testified that the pictures shown to Mr. Salk were the pictures he was showing to tipsters and others generally in an attempt to locate the missing woman.

Detective Sergeant Curtis Schram, of the Michigan State Police, interviewed Mr. Salk on May 10, 1990 at the Sterling Heights, Michigan Police Department. Sgt. Schram did not show Mr. Salk any photographs of Petitioner, but did show him photographs of other Chaldean men in an attempt to identify a second suspect. Subsequent to this interview, Mr. Salk worked with police sketch artists in an attempt to develop a sketch of the second kidnapper.[4]

Mr. Salk testified at Petitioner's preliminary examination, an evidentiary hearing, and at trial. While there are minor inconsistencies in his various testimonies, Mr. Salk clearly indicated that his in-court identification of Petitioner was based on his observations at the time of the abduction. He stated that it was light outside as he observed the event, that he was only about twelve feet away from the abduction and that he observed the abduction for about 20—40 seconds. Mr. Salk stated that he was 100% certain that Petitioner was the man inside the car who grabbed Ms. Kado and pulled her into the back seat. Moreover, Mr. Salk remained certain of his identification

---

2. The media had not been informed of the clothing worn by Ms. Kado when she disappeared and her clothing had not been described in any news reports concerning the crime.

3. At the time the photograph was shown to Mr. Salk, Petitioner had not been arrested, nor had

he been charged with any crime. Ms. Kado's body had not yet been discovered, so police were investigating only a missing person.

4. The second kidnapper has never been identified.

**1146**

throughout rigorous cross-examination by a member of Petitioner's defense team.[5]

### III. Additional Evidence of Petitioner's Guilt

While the remaining evidence does not go directly to the specific issue before the Court, it does demonstrate that there was overwhelming scientific and lay evidence of Petitioner's guilt. The Court will therefore briefly set forth other evidence admitted at trial.

Ms. Kado's mother, Clara Halcomb, called the Berkley, Michigan police about 10:00 p.m. on March 31, 1990 and reported that her daughter was missing. Officers began interviewing several people, including Petitioner, in an effort to determine her whereabouts. Officers interviewed Petitioner on March 31 at his home and on April 1 at the school where he taught. Officers noted that when they arrived at the school to interview Petitioner, there were fresh abrasions on Petitioner's hands.[6] During the interview at the school, Petitioner spoke of his former wife in the past tense, notwithstanding the fact that no body had been found and police did not yet know whether any crime had been committed. Officers also noted that throughout the interview Petitioner seemed nervous and his legs were shaking.

After the two police interviews of Petitioner, Ms. Kado's body was discovered on May 7, 1990. Officers obtained a search warrant for Petitioner's house to look for evidence of a crime. While searching the house on May 10, 1990, officers found a receipt for a split wedge dated March 27, 1990, the day Kado's divorce became final. After noting that Petitioner did not have either a fireplace, a woodpile or any recently felled trees on his property, the receipt was seized as evidence.[7] A detective then went to the store where the wedge had been purchased and bought another exactly like it. Dr. Werner Spitz had already conducted an autopsy and had concluded that the cause of death was several blows to the head with a blunt instrument. After Spitz released his findings, officers took the split wedge which they had purchased to Spitz and asked him whether it was consistent with the wounds found on Ms. Kado's head. Dr. Spitz compared the wedge to the wounds and concluded that a split wedge was consistent with the wounds and could very well be the weapon used to kill Ms. Kado. The actual murder weapon was never found.

Dr. Spitz further testified that the body was in four plastic garbage bags, as it had been cut with either an electric saw or a manual saw with small teeth.[8] The body was in three pieces—one bag contained the head, a second bag contained the arms and the torso down to the liver, and a third bag held the remaining torso and the legs. The fourth bag contained Ms. Kado's intestines, which had fallen out when the body was severed; in the bag with the intestines was a green wash cloth that contained vomit, partially digested food and a cap from a tooth. Dr. Spitz determined that the cloth was used as a gag and that Ms. Kado vomited when she was struck on the head and lost consciousness. The cap on the tooth was loosened by blows to the head, which caused the lower jaw to hit the upper jaw. The pathologist was certain that it would have taken two people to cut up the body in the manner in which it was found. Dr. Spitz found no evidence of sexual abuse, no defensive wounds and no signs of a struggle.

There was testimony that Petitioner was angry and upset by Ms. Kado's decision to divorce him. He stated that she would be sorry and would pay for ruining his life by divorcing him. The evening after the divorce became final, Petitioner told his girlfriend that the divorce made him feel as though someone were hitting him in the head over and over again with a sledge hammer. He

5. Petitioner was represented by three criminal defense attorneys.

6. One officer only saw Petitioner's right hand and testified to abrasions there. Another officers had a better view and noted abrasions on both hands.

7. According to trial testimony, a split wedge is a tool used to split logs into wood for use in fireplaces.

8. Dr. Spitz testified that it was most likely an electric hand-held saw.

also told her that his ex-wife had "fucked him over" and that he wanted to get back at her.

On March 30, 1990, Ms. Kado told her mother, and her friend Ann Marie Herty, that she would be meeting Petitioner and his brother after work the next morning because they were going to help her move some property from the marital home, where Petitioner still resided.[9] Telephone records reveal an outgoing call from Ms. Kado's work station at Beaumont Hospital to Petitioner's home on the morning of March 31, 1990 at 7:10 a.m. When she left work that morning around 7:20 a.m., Ms. Herty saw her turn east on Thirteen Mile Road and go in the direction of Northwood Shopping Center. Ms. Herty also testified that when they left work that morning, Ms. Kado was wearing a black and white checkered coat, jeans, a purple sweater and boots.

Later that same morning, Petitioner was scheduled to open his brother's store. He telephoned his brother at 9:30 a.m. and said he was having trouble getting his van started and would not be able to help at the store. The van was a dark red, full sized Ford Econoline. A few hours later, Petitioner showed up at his brother's store, driving the red van. One witness testified to seeing such a van in the parking lot at Northwood Center at about 7:00 a.m. When he looked out in the parking lot at about 7:30, the same witness saw a Toyota and noticed that the van was gone. Ms. Kado's Toyota was found in the parking lot after her disappearance, with the driver's door unlocked and her hospital tote bag still on the front passenger's seat.

At approximately 11:00 a.m. on March 31, 1990, two men were seen in Chesterfield Township standing by the side of a full-sized dark red van on a country road. Next to the van were several garbage bags. The description given of the two men matched the description of the two men Gerald Salk described as the abductors of Rose Marie Kado. As the witness drove past the scene, one of the men glared at him. The other man looked like Petitioner. Petitioner's friend and co-worker Khidir Mohammed testified that at approximately 11:15 a.m. on March 31, 1990, he received a call from Petitioner

asking if they could meet. When Mr. Mohammed informed Petitioner that he and his wife had an appointment, Petitioner replied that it would not take long, but that he needed to see him. They met at a fast-food restaurant near Mr. Mohammed's home at approximately 11:30 a.m. Petitioner was driving the red van. After Mr. Mohammed had been interviewed by police officers, he again met with Petitioner. He told officers that Petitioner told him "If anyone asks, we met at 11:00 a.m. on Saturday." He also told officers that Petitioner was wearing a brown sportcoat when they met on March 31.

In addition to the green wash cloth found in the bag with Ms. Kado's intestines, police found a mushroom-patterned dish towel. Both the green cloth and the dish towel were tested and it was determined that they were of the same pattern and came from the same cloth as dish towels found in Petitioner's home. Witnesses testified that the Kados owned such towels and that when they separated, each took half of the household linens. Hairs found in the bags with the body parts were also tested and it was determined that one hair was a match with Petitioner's hair. Police forensics experts testified that the match was particularly unusual because the hair found with the body had been dyed twice. Petitioner's barber testified that Petitioner dyed his hair, and a box of hair dye was found at Petitioner's home which was of a name brand and type that matched the dye on the tested hair.

## IV. Petitioner was not Denied Due Process by the In–Court Identification

Petitioner's sole claim in this habeas petition is that his right to due process of law was violated by Mr. Salk's in-court identification of him as the man Salk observed abducting Ms. Kado. Petitioner claims that the in-court identification was tainted by the prior photographic identification, which was impermissibly suggestive.

To determine whether an identification procedure violates due process, courts look first to whether the procedure was "impermissibly suggestive." If so, courts then

---

9. Ms. Kado worked the evening shift at the hospital, from 7:00 p.m. until 7:00 a.m.

**1148**

determine whether under the "totality of the circumstances", the suggestiveness has led to a "substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In evaluating the reliability of identifications, courts must consider:

1. The opportunity of the witness to view the criminal at the time of the crime;
2. The witness' degree of attention;
3. The accuracy of the witness' prior description of the criminal;
4. The level of certainty demonstrated by the witness at the confrontation; and
5. The length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382.

■ The threshold question is whether the photographic display was impermissibly suggestive: While single photograph displays are generally disfavored and are sometimes found to be suggestive, *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court does not find the display here impermissibly suggestive. Before showing Mr. Salk a photograph of Petitioner, Detective Johnson asked Mr. Salk to describe the men he saw forcing Ms. Kado into the car. Only after Salk's description of one of the men fit Petitioner did Detective Johnson show him the photograph. Detective Johnson knew that Ms. Kado was supposed to meet Petitioner the morning of her disappearance and he knew of the recent divorce. The fact that the police may have suspected Petitioner of involvement in his ex-wife's disappearance is reasonable under the circumstances.

■ Moreover, even if the photographic display was impermissibly suggestive, the inquiry does not end there. The question then becomes whether, under the totality of the circumstances, the suggestiveness has led to a substantial likelihood of irreparable misidentification. No such likelihood of misidentification is presented here, as an application of the *Biggers* factors demonstrates. Mr. Salk was only twelve feet away from the abduction and observed it during daylight. He was "100% sure" of his identification. He had an adequate opportunity to view Peti-

tioner at the time of the abduction. Salk's attention was drawn from his newspapers to the abduction because he heard swearing and loud voices. He recognized Ms. Kado as someone he had seen before at the shopping center and he testified that she looked at him with a frightened look on her face. He thus gave the event his total attention during the 20 to 40 seconds he observed it. His description of Petitioner before he was shown the photograph was general but accurate. His in-court identification was certain and withstood rigorous cross-examination by Petitioner's trial counsel. There were two weeks between the crime and the showing of Petitioner's photograph, which is not a particularly long period of time, especially given the accuracy and certainty of the identification. Mr. Salk described Ms. Kado's clothing when he had no way of knowing what she was wearing when she disappeared. His description of Petitioner's jacket was the same as that of Mr. Mohammed, a friend who saw Petitioner later the same morning and remembered that he was wearing a brown sportcoat. Thus, the totality of the circumstances demonstrates that the identification was reliable even if suggestive.

Petitioner relies on *Thompson v. Leeke,* 756 F.2d 314 (4th Cir.1985), but such reliance is misplaced. In *Thompson,* police showed an alleged eyewitness a six-photograph array ten days before trial and an officer pointed to the photograph of the petitioner and stated "that's the guy." Despite such blatant suggestiveness, the witness was unable to make the photographic identification. Nor had the witness been able to identify the petitioner when she was shown 12 photographs shortly after the robbery occurred. In contrast, Mr. Salk described Petitioner before he was shown any photographs and was able to make a positive identification at that time and to sustain his certainty each time he was called upon to testify.

Petitioner also relies on *United States v. Cueto,* 611 F.2d 1056 (5th Cir.1980), where witnesses were shown only two photographs—those of the defendants. The court held that such an array is impermissibly suggestive and turned to the issue of reliability. Noting that the level of certainty dem-

onstrated by one witness was weak, the court went on to point out that

> Kosiba never made an in-court identification of Cueto. In cases such as Manson and Hudson courts have relied upon clear and positive in-court identifications by the witnesses as an important factor to show the reliability of suggestive photographic displays. In those cases the witnesses were exposed to suggestive displays only before the trial as a means of preparing for a later in-court identification. In this case the improper photographic display constituted the witness' only identification of the defendant at the trial itself.

*Id.* at 1064. Here, Mr. Salk identified Petitioner, with certainty, during three separate court appearances. He testified that he was 100% certain that Petitioner was one of the kidnappers. *Cueto* is clearly distinguishable and does not dictate a different result here.

■ The Court concludes that when viewed in their totality, the circumstances lead to only one conclusion—Mr. Salk's identification of Petitioner was reliable. Even if the single photograph resulted in an impermissibly suggestive identification, such suggestiveness did not lead to a substantial likelihood of irreparable misidentification. Moreover, even without the Salk identification, substantial evidence of guilt exists. Petitioner was not denied his right to due process of law.

## V. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus is **DENIED.**