847 F.2d 1536
 Norman F. MARSDEN, Petitioner-Appellant,
v.
Louie MOORE, Sheriff, Chilton Co., Alabama, Respondent-Appellee.
Norman F. MARSDEN, Petitioner-Appellant,
v.
George BOWEN, Warden, Staton Correctional Facility, Elmore,
Alabama, Respondent-Appellee.
 Nos. 87-7174, 87-7708.
 United States Court of Appeals,
Eleventh Circuit.
 June 28, 1988.
 
 Hardwick, Knight & Haddock, Steven E. Haddock, Decatur, Ala., for petitioner-appellant.
 Don Siegelman, Atty. Gen., Rivard Melson, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before VANCE and CLARK, Circuit Judges, and GARZA*, Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 Norman Marsden, an Alabama prisoner serving a life sentence for murder, appeals the district court's denial of his petition for a writ of habeas corpus. Finding that none of the claims advanced by Marsden warrant habeas relief, we affirm.
 
 I.
 
 2
 Jerry Gillespie was found dead in his Huntsville, Alabama home on Monday, March 3, 1980. Gillespie had been shot once in the chest, struck in the back of the head, and stabbed. According to police, the living room of Gillespie's home "was disarrayed as if there had been a fight within the area." A bullet was found near Gillespie's body.
 
 
 3
 Marsden was arrested for the murder of Gillespie on August 18, 1980. His trial was continued at the state's request due to the absence of a material witness. Unable to locate the witness, the state nolle prossed the charges against Marsden on March 13, 1981 because of "insufficient evidence." Marsden was reindicted by the state in February of 1982, and he filed a motion for speedy trial two months later. In June of 1982, Marsden filed a plea of former jeopardy and a motion to dismiss the indictment on the ground that he had been denied a speedy trial. The state trial court denied the motion on June 28, 1982, the first day of Marsden's trial. At that time, the court also denied Marsden's motion for a change of venue due to excessive publicity.
 
 
 4
 The physical evidence from Gillespie's home did not conclusively implicate Marsden. The latent prints found at the home did not match Marsden's prints. Of the fifteen usable blood samples found at the murder scene, eleven were not consistent with Marsden's blood type and grouping, and four were consistent with the blood of both Gillespie and Marsden. In addition, none of the fibers and hairs found at the murder scene belonged to Marsden.
 
 
 5
 The state's theory of the murder was that Marsden had killed Gillespie after finding out that Gillespie had been seeing his wife. Faced with inconclusive physical evidence from the murder scene, the state built a circumstantial case against Marsden. Witnesses for the prosecution testified that Gillespie had met Marsden's second wife, Joanne, sometime in 1978, that Joanne Marsden had accompanied Gillespie to his farm-hunting club in the summer of 1979, that in January of 1980 Gillespie received a bottle of whiskey which contained ethylene glycol (a constituent of antifreeze) and that in February of 1980 Marsden was seen in the parking lot adjacent to the building where Gillespie's business office was located. The state also introduced into evidence a .357 magnum handgun with several parts missing or damaged and the serial number filed off. The gun had been found wrapped in a white plastic bag in a dry lake bed in an adjacent county. The serial number of the gun, which was restored by police through standard acid etching procedures, matched that of a gun purchased by Marsden about three weeks before the murder. A firearms expert testified that he reassembled the gun and that, after conducting some tests, it was his opinion that the gun found in the lake bed fired the bullet found at Gillespie's home. Gene Stuttles, Marsden's twelve-year old stepson (and Joanne's son by a previous marriage), testified that Marsden told Joanne that if she called the police to have him picked up she herself would be taken in for aiding and abetting the murder.
 
 
 6
 The state also theorized that Marsden had sustained a hand injury in a scuffle with Gillespie on the night of the murder, and had gone to Vanderbilt Hospital the following day to get medical treatment for the injury. Three witnesses placed Marsden at Vanderbilt Hospital on March 3-4, 1980. Marsden's stepson testified that he accompanied his mother and Marsden to Nashville to have stitches put in Marsden's hand.[1] Dr. James Madden, a surgeon, testified that he had performed surgery for a flexor tendon laceration on the hand of an individual he knew as Edward Nelson on March 3 or 4 of 1980 at Vanderbilt Hospital. After examining a scar on Marsden's left hand outside the presence of the jury, Dr. Madden stated that Marsden's scar was identical to the incision he had made on Nelson's hand. Dorothy Gregory, whose husband shared a room with Nelson on March 3-4, 1980 at Vanderbilt Hospital, testified that Marsden was the patient who was in her husband's room. A week before trial, and twenty-seven months after her husband had been at Vanderbilt Hospital, Gregory had been unable to identify Marsden as the individual who shared her husband's room from photographs shown to her by police.[2]
 
 
 7
 After the state rested, the defense presented its case. Neither Marsden nor his wife Joanne took the stand. Dudley Powell testified that on March 2, 1980, as he walked his dog near Gillespie's home at about 7:30 p.m., he heard a woman's scream and a gunshot. Marsden's first wife, Yolanda, testified that she had spoken to Marsden when she phoned Marsden's parents' home at around 8:00 p.m. on March 2, 1980. Marsden's son and relatives also placed him at his parents' home on the night of March 2, 1980 until around 9:00 p.m. Marsden's brother testified that neither he nor Marsden knew Gillespie. He also testified that on February 24, 1980 Marsden sold a .357 magnum handgun to an unknown individual who had become interested in it while shooting in a target area near Huntsville.
 
 
 8
 The jury found Marsden guilty of murder. Marsden appealed, raising a host of issues. The Alabama Court of Criminal Appeals remanded the case to the trial court to resolve a conflict over Marsden's arraignment, but the Alabama Supreme Court reversed, holding that Marsden had waived his right to be arraigned. See Marsden v. State, 475 So.2d 586 (Ala.Crim.App.1983), rev'd, 475 So.2d 588 (Ala.1984). On remand, the Alabama Court of Criminal Appeals affirmed Marsden's conviction without opinion. See Marsden v. State, 475 So.2d 589 (Ala.Crim.App.1984).
 
 
 9
 After pursuing direct appeals, Marsden filed a petition for a writ of habeas corpus in the district court. He argued that (1) excessive publicity made it impossible for him to be tried by a fair and impartial jury, (2) he was improperly required to show a scar to a witness, (3) the testimony of Dorothy Gregory was inadmissible because it was the result of improper identification procedures, (4) the prosecutor improperly commented on his right to remain silent, (5) he was denied his Sixth Amendment right to a speedy trial, (6) the trial court failed to instruct the jury on the lesser included offense of manslaughter, and (7) he was not arraigned prior to trial. The district court, adopting the magistrate's report and recommendation, denied Marsden's petition. On appeal, Marsden raises all of the claims presented to the district court except for the arraignment claim. He also contends that the district court erred in not conducting an evidentiary hearing.
 
 II.
 A.
 
 10
 Marsden claims that the state trial court should have granted his motion for a change of venue because of pervasive publicity in the community where he was charged and tried. We disagree.
 
 1.
 
 11
 Gillespie's brother was the county commission chairman of Madison County, Alabama, where Huntsville is located. Consequently, Gillespie's murder generated a good deal of interest in Huntsville. From August of 1980, when Marsden was first arrested, to July of 1984, when the Alabama Supreme Court held that Marsden had waived his right to an arraignment, sixty-one newspaper articles alluding to Marsden's prosecution and trial appeared in Huntsville newspapers. Thirty-five of the articles appeared before Marsden's trial.
 
 
 12
 The articles described police reports about the murder, Marsden's arrest and indictment, the district attorney's contentions and his opposition to Marsden's bond, the pretrial and trial procedures, the role that Marsden's wife played in the prosecution's case, and the financial problems faced by Gillespie at the time of his death. Six of the articles were accompanied by Marsden's photograph. Seven of the articles simply mentioned Marsden's indictment or Huntsville (e.g., "Grand Jury Indicts Five in Slaying, 100 Others," Huntsville Times, Oct. 16, 1980). Sixteen of the articles were front-page stories.
 
 
 13
 One particular newspaper article contained information which was prejudicial to Marsden. On Sunday, June 27, 1982, the day before jury selection in Marsden's case was to begin, the Huntsville Times published a front page article entitled "Marsden Trial Begins Monday." In pertinent part, the article stated:
 
 
 14
 At the time of the 1980 arrest, which stemmed from his wife Joanne's cooperation with prosecutors, Marsden was listed in media reports as a Huntsville investment counselor[.]
 
 
 15
 ....
 
 
 16
 Joanne Marsden agreed to help police and the district court's office after giving a letter to a friend which was to be opened only upon her "death or institutionalization." The friend subsequently gave the letter to the authorities, who contacted Joanne Marsden.
 
 
 17
 The letter ... details events which allegedly occurred shortly after Gillespie's death.
 
 
 18
 The letter said Marsden told his wife if she made a "wrong move" a knife would "go through her son's heart." The letter said Marsden said the knife was just "pulled out of Jerry's back."
 
 
 19
 Mrs. Marsden said in the letter she feared for her life and her son's life, and that Marsden was a "fantastic actor and can sell himself beautifully.... He is attempting to convince everyone that I am crazy[.]" The letter also described how the couple disposed of the gun allegedly used in the Gillespie killing. Police detectives later recovered a gun registered to Marsden at a pond which is on land owned by Joanne Marsden's family in Morgan County.
 
 
 20
 About a month after the letter was given to police investigators, Mrs. Marsden told District Court Judge Hartwell B. Lutz she wanted to exercise her legal right not to testify against her husband. Lutz granted her request and Mrs. Marsden disappeared from the city shortly thereafter.
 
 
 21
 ....
 
 
 22
 The letter written by Joanne Marsden was read into evidence at the preliminary hearing on the hindering prosecution charge [against her] in District Judge Jeri Blankenship's court. The case was then bound over to the ... grand jury. Joanne Marsden was indicted on that charge in 1981. However, because Mrs. Marsden is not now cooperating with prosecutors, the letter will not be admissible at Marsden's trial, court officials said.
 
 
 23
 Record, Tab 1 at # 34.
 
 
 24
 In addition to the newspaper reports, Marsden's case received radio and television coverage. For example, on March 27, 1982, three months before Marsden's trial, radio station WAAY, which had the largest audience among persons eighteen years of age and older in the metropolitan Huntsville area, broadcast this story:
 
 
 25
 The Madison County Grand Jury ... has indicted Norman F. Marsden and his wife, Joanne on murder charges involving the death of Jerry Gillespie in March of 1980. Marsden [is] accused of the murder of his business associate, Jerry Gillespie.... During the preliminary hearing Mrs. Marsden testified that she feared for the life of herself and son by a previous marriage, if Norman Marsden was released on bond. Judge Hartwell Lutz did release Marsden. And Joanne, who had been cooperating with ... detectives ... by supplying them with information and evidence and is reported to have taken them to the location of the murder weapon, she at that time invoked her right to refuse to testify against her husband. At that point, the District Attorney dismissed the charges against Marsden. Later, Joanne was indicated [sic] by the Grand Jury and charged with hindering the prosecution of their case. She was apprehended by F.B.I. agents in California and returned to Huntsville.
 
 
 26
 State Court Trial Transcript, Vol. I at 9.
 
 
 27
 At a hearing on Marsden's motion for a change of venue, representatives of the two top radio stations in Huntsville and the news director of a Huntsville television station testified that Marsden's case was considered a leading story and that they had run numerous stories on the case. The trial court denied the motion for a change of venue, but Marsden renewed his motion on the day of jury selection on the ground that the June 27, 1982 article in the Huntsville Times had made it impossible for him to receive a fair trial. The trial court again denied the motion, and refused to allow Marsden's counsel to examine the prospective jurors in small groups about the newspaper article and the effect of the pretrial publicity:
 
 
 28
 [COUNSEL]: Judge, our request was to, say, do it in a group of ten and exclude the other thirty from the question.
 
 
 29
 THE COURT: I am not going to do that.
 
 
 30
 [COUNSEL]: And the reason and grounds for that is because of the recent article that appeared in the paper, it is almost impossible to ask them anything about the article other than did you read it? Because if you go into about the letter and what the wife said, and she is not ... available to testify, you clearly get into evidence that will not be at the trial.
 
 
 31
 THE COURT: ... I think you can ask them in one group[.]
 
 
 32
 [COUNSEL]: Does that mean, Your Honor, individually in front of the others?
 
 
 33
 THE COURT: Sure. I am not going to take Jurors one at a time or in a small panel.
 
 
 34
 State Court Trial Transcript, Vol. I at 56-57.[3]
 
 
 35
 During voir dire thirty-two of the forty prospective jurors stated that they had read, seen or heard about the alleged facts in Marsden's case. Sixteen of the forty had read in part or in whole the June 27, 1982 article in the Huntsville Times[4] quoting the incriminating statements made by Marsden's wife. Four members of the jury venire stated that they had formed some type of opinion as to the case. Of these four prospective jurors, three stated that they could put aside their opinions and fairly evaluate the evidence presented at trial. The prospective juror who stated that the Huntsville Times article would sway him was stricken for cause.
 
 2.
 
 36
 "The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' " Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (citation omitted). If a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere," it must grant the defendant's motion for a change of venue or a continuance. See Sheppard v. Maxwell, 384 U.S. 333, 362-63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966); Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). Claims of prejudicial publicity are analyzed under two different standards, the "presumed prejudice" standard and the "actual prejudice" standard. We discuss each standard separately.
 
 
 37
 a.
 
 
 38
 Juror prejudice is presumed from pretrial publicity when such publicity is sufficiently prejudicial and inflammatory and saturated the community where the trial was held. Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir.), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). "The presumed prejudice principle is 'rare[ly]' applicable, and is reserved for an 'extreme situation.' " Id. at 1490 (quoting Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), and Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir.1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981)). See, e.g., Rideau, 373 U.S. at 724-27, 83 S.Ct. at 1418-20 (prejudice was presumed where defendant's confession to robbery, kidnapping and murder was videotaped and shown three times by television stations, and the three broadcasts were seen by 24,000, 53,000, and 29,000 people in a community with a population of 150,000); Coleman, 778 F.2d at 1491-1543 (excessive pretrial publicity prejudging guilt and sentence of defendants charged with killing a family in a rural county with a population of 7,000 was sufficiently prejudicial and inflammatory to warrant a finding of presumed prejudice). In determining whether prejudice can be presumed, we must examine the totality of the circumstances. No single factor is dispositive. Murphy, 421 U.S. at 799, 95 S.Ct. at 2035.
 
 
 39
 Most of the publicity regarding Marsden's case was factual, and not sensational or inflammatory. The only articles or stories which can be labeled prejudicial are the Huntsville Times article which appeared the day before the trial and the WAAY radio broadcast three months before the trial detailing Joanne Marsden's alleged (and inadmissible)[5] incriminating statements to police about Marsden's guilt in Gillespie's murder. Although the publication of the Huntsville Times article on the eve of Marsden's trial makes the question closer, after a careful review of the record we cannot say that Marsden has met the "extremely heavy" burden, Coleman, 778 F.2d at 1537, of demonstrating that the publicity surrounding his trial was sufficiently prejudicial or inflammatory to establish presumed prejudice. See Dobbert v. Florida, 432 U.S. 282, 302-03, 97 S.Ct. 2290, 2302-03, 53 L.Ed.2d 344 (1977) (fact that community was made well aware of defendant's crimes was not sufficient to render trial fundamentally unfair); Murphy, 421 U.S. at 797-803, 95 S.Ct. at 2034-38 (extensive factual publicity of defendant's former crimes which was "largely factual in nature" and appeared seven to twenty months before defendant's jury was selected did not cause inflamed community atmosphere); Ross v. Hopper, 716 F.2d 1528, 1540-41 (11th Cir.1983) (prejudice not presumed where press coverage, although extensive, was not pervasive or inflammatory, all prospective and actual jurors had heard about the case, six prospective jurors indicated that they had preconceived notions about defendant's guilt or innocence based on pretrial publicity, and the three prospective jurors who stated that they could not set aside their preconceived opinions of the case were stricken for cause).[6]
 
 
 40
 b.
 
 
 41
 In order to prove that the jury which convicted him was actually prejudiced, Marsden must show that some of the jurors "had a preconceived notion as to [his] guilt or innocence that they [could] not lay aside." Johnson v. Kemp, 759 F.2d 1503, 1510 (11th Cir.1985). A juror's assurances that he can lay aside his impression or opinion and render a verdict based upon the evidence presented in court "cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' " Murphy, 421 U.S. at 800, 95 S.Ct. at 2036 (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)).
 
 
 42
 The voir dire in this case does not indicate a hostility to Marsden by the jurors that would suggest an impartiality that could not be set aside. Thirty-two of the forty prospective jurors had heard or read something about the case and sixteen had read the previous day's article in the Huntsville Times, but only four of them stated that they had formed some type of an opinion on the case. Of those four, one stated that he could put his opinion aside because "he [knew] how those articles [were]," and another stated that he would not be swayed because the media only presented one side of the case. The one prospective juror who indicated that his previous opinion would affect him was challenged for cause and did not become a member of Marsden's jury.
 
 
 43
 Because the trial court did not allow Marsden's counsel to question each prospective juror outside the presence of the other members of the jury venire, Marsden's claim of actual prejudice cannot be easily dismissed. Nonetheless, we do not believe that Marsden has proved that the jury which convicted him was actually prejudiced against him. "In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question [because] it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it." Murphy, 421 U.S. at 803, 95 S.Ct. at 2037. But such was not the situation in this case. Only four of the forty prospective jurors had formed some type of opinion about the case. Marsden's case is far removed from cases like Irvin, where the defendant was denied a fair trial because 90% of the prospective jurors and eight of the twelve actual jurors believed (in varying degrees) that he was guilty. See 366 U.S. at 727, 81 S.Ct. at 1645.
 
 B.
 
 44
 Marsden contends that his trial was rendered fundamentally unfair when he was compelled to show his hand to Dr. Madden outside the presence of the jury in violation of the Alabama Constitution. In order for an erroneous state evidentiary ruling to violate fundamental fairness, the prejudicial evidence in question must be material in the sense of a " 'crucial, critical significant factor.' " Corpus v. Estelle, 571 F.2d 1378, 1381 (5th Cir.) (citations omitted), cert. denied, 439 U.S. 957, 99 S.Ct. 359, 58 L.Ed.2d 350 (1978).
 
 
 45
 It seems clear that compelling Marsden to show his hand to Dr. Madden outside the presence of the jury did not violate the Fifth Amendment. "It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the [Fifth Amendment] privilege against self-incrimination." United States v. Dionisio, 410 U.S. 1, 5-6, 93 S.Ct. 764, 767, 35 L.Ed.2d 67 (1973). See, e.g., United States v. Bay, 762 F.2d 1314, 1315-16 (9th Cir.1984) (defendant's showing of hands to the jury did not violate Fifth Amendment).
 
 
 46
 The Alabama Constitution provides that "in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Ala. Const. art. I, Sec. 6 (1975). Alabama courts have interpreted the self-incrimination provision of the state constitution to mean that a defendant cannot be compelled to stand for inspection by a witness before the jury if he objects and has not testified. See Smith v. State, 247 Ala. 354, 24 So.2d 546, 549 (1946). See also Harnage v. State, 290 Ala. 142, 274 So.2d 352, 355 (1972) (court could have allowed defendant's hands to be inspected by the jury only if defendant consented). It is, however, proper "for another person to do an act against the will of the defendant which relates to his person, and thereby cause to be revealed matter material as evidence against him," and "facts ascertained and opinions formed by an examination [performed without the defendant's] consent or when [the] consent to the examination was improperly obtained are not inadmissible on that account." Hunt v. State, 248 Ala. 217, 27 So.2d 186, 193-94 (1946).
 
 
 47
 In relatively recent cases, the Alabama Supreme Court has indicated that article I, Sec. 6 provides the same degree of protection as the Fifth Amendment. For example, in construing article I, Sec. 6, the court has quoted with approval the following language from a United States Supreme Court opinion:
 
 
 48
 "We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance."
 
 
 49
 Hubbard v. State, 283 Ala. 183, 215 So.2d 261, 267 (1968) (quoting United States v. Wade, 388 U.S. 218, 222, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967)). In a case decided after Hubbard, the court stated that the "Alabama privilege against self-incrimination offers the same guarantee as that contained in the Federal Constitution," and concluded that article I, Sec. 6 therefore extended "only to evidence of a testimonial or communicative nature." Hill v. State, 366 So.2d 318, 322 (Ala.1979).
 
 
 50
 We disagree with Marsden that requiring him to display his hand to Dr. Madden violated his privilege against self-incrimination under article I, Sec. 6 of the Alabama Constitution. First, article I, Sec. 6 does not offer more protection than the Fifth Amendment, and the Fifth Amendment does not forbid the compelled display of physical characteristics. Second, as far as we can tell, the Alabama courts have not extended cases like Smith and Harnage to situations where the defendant is examined outside of court by a person who later testifies at the defendant's trial. On the contrary, Hunt, Hubbard, and Hill imply that such an out-of-court compelled examination would not violate article I, Sec. 6. See, e.g., Huff v. State, 452 So.2d 1352, 1353-54 (Ala.Crim.App.1984) (defendant's privilege against self-incrimination was not violated when he was required to open his mouth and show his teeth to a witness at trial). Because we find that Dr. Madden's testimony was properly admitted under the Alabama Constitution, we do not need to address whether its admission violated Marsden's right to a fundamentally fair trial.
 
 C.
 
 51
 Marsden contends that his due process rights were violated because Dorothy Gregory's in-court identification of him did not have a reliable basis independent of an impermissibly suggestive pretrial photographic identification procedure. Determining whether an identification is so unreliable as to violate due process requires us to answer two questions: (1) whether the original identification procedure was unduly suggestive; and if so, (2) whether the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial. Dobbs v. Kemp, 790 F.2d 1499, 1506 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987).
 
 
 52
 Gregory's husband was hospitalized at Vanderbilt Hospital from March 3-5, 1980, and shared a room with another patient. A week before trial, and twenty-seven months after her husband had been hospitalized, the police contacted Gregory for the first time and asked her about the man in her husband's room. Gregory told the police that her husband's roommate was a white man in his thirties and had a cast on his left hand. The police then showed Gregory three photographs: one of Marsden alone in a police mug shot, one of Marsden and his wife, and another of Marsden's wife alone. Gregory told the police that she could not identify her husband's roommate from the photographs.
 
 
 53
 After sitting through the first day of the trial, Gregory identified Marsden as the man who shared her husband's room. Gregory testified that she had seen Marsden only twice--once while he was lying in his bed, and once as he walked four feet to the bathroom. Although Gregory only saw the profile of her husband's roommate when he went to the bathroom, she testified that she got a better view of him when he went to the bathroom than when he was in bed.
 
 
 54
 There is no question that the pretrial photographic identification procedure, in which Marsden was the only male in the photographs shown to Gregory, was unduly suggestive. See, e.g., Dobbs, 790 F.2d at 1506 (procedure unduly suggestive where witness was shown four photographs, all of the defendant); O'Brien v. Wainwright, 738 F.2d 1139, 1140-41 (11th Cir.1984) (procedure unduly suggestive where witness was shown all black and white mug shots except for one color photograph of the defendant), cert. denied, 469 U.S. 1162, 105 S.Ct. 918, 83 L.Ed.2d 931 (1985); United States v. Cueto, 611 F.2d 1056, 1063 (5th Cir.1980) (procedure unduly suggestive where witness was shown one photograph of the defendant); Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir.1979) (procedure unduly suggestive where the only eyewitness was shown two photographs the day before trial, one of the defendant and one of a codefendant), cert. denied, 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 772 (1980). Even though Gregory was not able to identify Marsden as her husband's roommate from the photographs, the procedure was still overly suggestive because it gave Gregory a frame of reference for her later in-court identification of Marsden.
 
 
 55
 To determine whether Gregory's identification of Marsden had a reliable and sufficient basis independent of the suggestive photographic display, we must analyze several factors: (1) Gregory's opportunity to view Marsden at Vanderbilt Hospital; (2) Gregory's degree of attention at that time; (3) the accuracy of Gregory's prior description of Marsden; (4) the level of certainty demonstrated by Gregory at the trial identification; and (5) the length of time between the time Gregory allegedly saw Marsden at the hospital and the time she identified him. Cueto, 611 F.2d at 1064 (citing Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977)). Although Gregory was certain of her identification of Marsden at trial, all the other Cueto factors suggest that Gregory's identification did not have a reliable and sufficient independent basis. First, Gregory only saw her husband's roommate twice at the hospital. More importantly, both glimpses were brief, and Gregory never got a full frontal view of the man sharing her husband's room. Second, there is nothing in Gregory's testimony to indicate that her degree of attention was acute at the times she saw her husband's roommate. Unlike a policeman, Gregory was not trained to pay scrupulous attention to detail, and nothing unusual (e.g., aberrant behavior) made her pay special attention while at the hospital. Third, Gregory's description of the man who shared her husband's room--a white man in his thirties with a cast on his left hand--was very general. Fourth, over two years elapsed between the time Gregory's husband was at Vanderbilt Hospital and the time she identified Marsden at trial. Common sense dictates that human memory is bound to lose some degree of recall during such a prolonged period of time. On balance, we find that the pretrial photographic display was impermissibly suggestive and that Gregory's testimony does not reveal that her identification of Marsden at trial was otherwise reliable. We therefore conclude that Marsden's due process rights were violated when Gregory's identification testimony was admitted.
 
 
 56
 The state argues, however, that any errors in Gregory's identification are harmless in light of other evidence adduced at trial. Unreliable identifications resulting from unduly suggestive photographic displays are subject to harmless error analysis. See United States v. DeSimone, 660 F.2d 532, 543 (5th Cir. Unit B Nov. 1981), cert. denied, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982); Cueto, 611 F.2d at 1064-65. The question of whether a constitutional error is harmless cannot be answered by considering the error in isolation. It is necessary to review the facts of the case and the evidence presented at trial to determine the effect of the unlawfully admitted evidence upon the other evidence at trial. A constitutional error in the admission of evidence cannot be harmless if there is a "reasonable probability that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).
 
 
 57
 Under this standard, we find that Gregory's improper identification of Marsden as the man who shared her husband's room at Vanderbilt Hospital following Gillespie's murder was harmless error. We come to this conclusion for several reasons. First, Gregory was only one of three witnesses who placed Marsden at Vanderbilt Hospital the day after the murder. Marsden's stepson testified that Marsden went to the hospital because his hand was cut, and Dr. Madden, a Vanderbilt Hospital surgeon, testified that the scar on Marsden's hand was identical to the one he had made on a patient named Edward Nelson on March 3-4, 1980. Second, police recovered a gun which Marsden had purchased before the murder, and a firearms expert testified that the bullet found at Gillespie's home was fired from that gun. Third, there was testimony that Marsden's wife had been seen with Gillespie, thereby providing a motive for the murder. Fourth, Marsden's stepson testified that Marsden told his wife, Joanne, that if she called the police to have him picked up, she would also be picked up for aiding and abetting the murder.
 
 D.
 
 58
 Marsden alleges that on three occasions the prosecutor improperly commented on his right not to testify. According to Marsden, one of the three comments was a direct reference, and the two others were indirect references.
 
 
 59
 A statement by a prosecutor is improper if it was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). Comments "on the failure of the defense, as opposed to that of the defendant, to counter or explain the testimony presented or evidence introduced is not an infringement on the [defendant's] Fifth Amendment privilege." Duncan v. Stynchcombe, 704 F.2d 1213, 1215-16 (11th Cir.1983). In determining the propriety of a prosecutorial remark, we must look at the context in which the statement was made. Betancourt, 734 F.2d at 758. Our task in evaluating the comments in this case is more difficult than usual because in Alabama the opening and closing arguments of counsel are not transcribed--the court reporter records only the objections of counsel during those arguments. Consequently, the only statements that we have before us are the statements of the prosecutor as paraphrased by Marsden's counsel in his objections. Under Alabama law, a defendant objecting to a prosecutorial comment must quote, fully or substantially, the improper remarks when objecting in order to preserve the objection for appellate review. Jones v. State, 460 So.2d 1382, 1383 (Ala.1984). Because Marsden's counsel substantially restated the allegedly improper statements in his objections, we proceed to review Marsden's claims.[7]
 
 1.
 
 60
 During closing argument, the prosecutor made a direct comment on Marsden's failure to testify. Marsden's counsel objected: "We except. We object to that portion of the State's remark that the Defendant is not here today denying that he wasn't at the scene because his hair wasn't there at the scene. Thank you, Judge." The trial court overruled the objection by Marsden's counsel. State Court Trial Transcript, Vol. V at 902-03.
 
 
 61
 In his habeas petition, Marsden alleged only that his constitutional rights were violated when the prosecutor made "inadmissible comments about [his] election not to testify." Marsden's amended petition did not elaborate on the claim of improper prosecutorial comment made in the original habeas petition. In addition, Marsden's brief in support of his petition did not set forth the direct comment. Rather, it only set forth the two indirect comments. Moreover, Marsden's supplemental brief did not touch upon the issue of prosecutorial comment. Simply stated, Marsden never specified, quoted, or cited the direct comment in his petitions and briefs before the district court.
 
 
 62
 The magistrate, not being apprised that the direct comment was at issue (or that a direct comment even existed), only ruled on the two indirect comments, which Marsden had set forth in his brief, and never addressed the direct comment Marsden now complains about. In objecting to the magistrate's report and recommendation that his habeas petition be denied, Marsden stated:
 
 
 63
 The Magistrate is incorrect regarding his reasoning pertaining to Petitioner's failure to testify. This Magistrate failed to consider the record regarding the fact that the state trial court, when considering the prosecution's direct comment about Petitioner not testifying, stated "[o]verruled. The jury knows the defendant has already plead [sic] not guilty." This statement clearly falls within the parameters of Duncan v. Stynchcombe, 704 F.2d 1213, 1215 (11th Cir.1983).
 
 
 64
 Record, Tab 20 at 7.
 
 
 65
 Where an issue raised on appeal by a habeas petitioner has not been advanced in the district court, it is not properly before the court of appeals. See Campbell v. Wainwright, 738 F.2d 1573, 1575-76 (11th Cir.1984), cert. denied, 475 U.S. 1126, 106 S.Ct. 1652, 90 L.Ed.2d 195 (1986). Marsden did not bring to the magistrate's attention either in his petitions or his brief that the prosecutor had made a direct comment on his failure to testify. In addition, his objection to the magistrate's report was not as clear as it could have been. Although Marsden alluded to the "direct comment," he did not quote the remark or give a record cite to it in his objection. Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court. Nettles v. Wainwright, 677 F.2d 404, 410 n. 8 (5th Cir. Unit B 1982). Marsden's objection was not frivolous or conclusive, but it was inadequate under the circumstances. Because he did not specifically set out the direct comment in his petitions or accompanying briefs, it was incumbent upon Marsden to ensure that the district court was apprised of the direct comment by specifically mentioning it in his objections to the magistrate's report.
 
 
 66
 Marsden's failure to fulfill this obligation would ordinarily preclude us from addressing the constitutionality of the prosecutor's direct comment on his failure to testify. If we do not address this issue at this time, however, it will likely result in a new petition for a writ of habeas corpus, a new hearing, and a new appeal.[8] In order to avoid this situation, which would further expend scarce judicial resources, and because the constitutionality of the direct comment is a question of law, we reach the merits of Marsden's claim. See Long v. McCotter, 792 F.2d 1338, 1345 (5th Cir.1986) (court of appeals would consider claim of habeas petitioner not raised in the district court where claim was question of law that could be considered on the face of the record established, and failure to address claim would likely result in a new petition, a new hearing, and a new appeal).
 
 
 67
 Under circuit precedent, the prosecutor's direct comment was improper. See United States v. Griggs, 735 F.2d 1318, 1324 (11th Cir.1984) (prosecutor's comment that the defendant's attorney had asked the jury to assume that the defendant was afraid of an unjustified conviction "even though the defendant ha[d] not testified about it" was an impermissible comment on the defendant's failure to testify). Such an improper comment, however, does not necessarily warrant reversal of Marsden's conviction. See Chapman v. California, 386 U.S. 18, 24-26, 87 S.Ct. 824, 828-29, 17 L.Ed.2d 705 (1967) (unconstitutional prosecutorial comment on defendant's failure to testify is subject to the harmless error rule). For the reasons stated in Part II.C., specially the fact that the gun which fired the bullet found at the murder scene was traced to Marsden, we find that the improper comment on Marsden's failure to testify, though constitutional error, was harmless beyond a reasonable doubt.
 
 2.
 
 68
 During closing argument, the prosecutor made two references to evidence or lack thereof in the case. Marsden's counsel objected both times. After the first comment, he stated: "I object to that portion of his argument with regard to what Norman Marsden told Joanne just after this happened, he is alluding to the fact that the Defendant did not take the stand." After the second, he said: "We object to that portion of his argument where he says you have not heard from anyone in this case as to where that bottle came from. We think there is an inference there that he is commenting that the Defendant failed to take the stand, and we object and move to strike that statement." The trial court sustained both objections. State Court Trial Transcript, Vol. V at 900-02.
 
 
 69
 We conclude that the two indirect comments by the prosecutor were references to the failure of the defense to counter or explain the prosecution's theory or evidence (Who placed the poisoned whiskey on Gillespie's porch? What did Marsden supposedly tell his wife after Gillespie's death?), and not comments upon Marsden's failure to take the stand. See Stynchcombe, 704 F.2d at 1215 (prosecutor's comment that "there has been no evidence from the defense at all that [the defendant] was not in that house" was a proper reference to the failure of the defense to offer any alibi evidence as to defendant's whereabouts at the time of the crime). They therefore did not violate Marsden's Fifth Amendment right to remain silent.
 
 E.
 
 70
 Marsden also claims that his right to a speedy trial was violated, that the state trial court erred in not instructing the jury on the lesser included offense of manslaughter, and that the district court erred in not holding an evidentiary hearing. We agree with the magistrate and the district court that Marsden is procedurally barred from raising the speedy trial issue and that the state trial court did not err in refusing to instruct the jury on manslaughter. Our disposition of Marsden's other claims makes it clear that the district court did not err in refusing to conduct an evidentiary hearing.
 
 III.
 
 71
 We find that none of the claims advanced by Marsden warrant granting his petition for a writ of habeas corpus. Accordingly, the decision of the district court is affirmed.
 
 
 72
 AFFIRMED.
 
 
 
 *
 Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Prior to testifying, Marsden's stepson had met with prosecutors and had visited Nashville with the district attorney and police detectives
 
 
 [2]
 On cross-examination, Marsden's mother testified that she had seen a bandage on her son's hand the weekend after Gillespie's murder
 
 
 [3]
 As we have previously stated, where there is a substantial possibility of prejudice, the preferable voir dire procedure is to examine each juror with respect to exposure " 'outside the presence of other chosen and prospective jurors.' " Coleman v. Kemp, 778 F.2d 1487, 1542 (11th Cir.), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The sequestered individual voir dire of jurors "is not unusual, nor viewed with suspicion." In re Greensboro News Co., 727 F.2d 1320, 1323 (4th Cir.1984). Indeed, the practice has been endorsed by the Judicial Conference of the United States and the American Bar Association. See Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press--Fair Trial" Issue, 87 F.R.D. 519, 532-33 (1980); ABA Standards for Criminal Justice, Fair Trial and Free Press, Standard 8-3.5. The trial court's refusal to allow separate questioning in this case is disfavored because the "psychological impact requiring ... a declaration [of impartiality] before one's fellows is often its father." Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961)
 
 
 [4]
 At the time of Marsden's trial, the Huntsville Times had a daily circulation of 45,000-55,000, and a Sunday circulation of 60,000-68,000
 
 
 [5]
 The trial court ruled that the contents of the letter described in the article were inadmissible. See State Trial Court Transcript, Vol. II at 58-66
 
 
 [6]
 It is conceivable that an inordinate amount of factual reports or broadcasts by the print and electronic media can be sufficient to establish presumed prejudice, but such is not the case here
 
 
 [7]
 Despite the state's suggestions to the contrary, Alabama law does not require defense counsel to act as court reporter (by restating most of the prosecutor's argument) when objecting. Even if the state is correct in asserting that defense counsel must restate most of the prosecutor's closing remarks from memory in order to preserve an objection to an improper comment, we doubt that failure to adhere to that requirement would procedurally bar a defendant from raising a claim of improper comment on direct or collateral review. Such a requirement might well violate constitutional requirements of due process--"a reasonable opportunity to have the issue as to the claimed right heard and determined by the state court." Michel v. Louisiana, 350 U.S. 91, 93, 76 S.Ct. 158, 160, 100 L.Ed. 83 (1955). See generally Spencer v. Kemp, 781 F.2d 1458, 1469-71 (11th Cir.1986) (discussing when state procedural rules will not bar federal review of federal claims)
 
 
 [8]
 As a matter of fact, such a sequence of events has already taken place. While this appeal was pending, Marsden filed a second habeas corpus petition in the district court, raising only the impropriety of the direct comment. The district court dismissed the petition, holding that it no longer had jurisdiction over the case. Marsden appealed the district court's ruling, and we consolidated that appeal with the original appeal. We affirm the district court's dismissal of Marsden's second petition. The general rule is that an appeal to a circuit court divests the district court of jurisdiction as to any matters involved in the appeal. Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985). Although the rule is not a statutory one and is not absolute, Jago v. U.S. District Court, 570 F.2d 618, 622 (6th Cir.1978), we see no reason to deviate from it in these circumstances. If Marsden wanted to present the direct comment issue to the district court while the appeal was pending, he should have asked the panel for leave to do so