[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 27, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-11208
Non-Argument Calendar

_____

D. C. Docket No. 01-00587-CR-JTC-5-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILSON JEAN,
a.k.a. Nixon,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(February 27, 2009)**

Before BIRCH, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Wilson Jean ("Jean") appeals his conviction for conspiracy to make and sell counterfeit currency. Jean raises three issues on appeal: (1) the district court erred in admitting evidence seized from a Brooklyn, New York apartment in August 2001; (2) a co-defendant's in-court identification of Jean was tainted by an unduly suggestive out-of-court identification procedure; and (3) there was insufficient evidence to support his conviction. For the following reasons, we AFFIRM.

## I. BACKGROUND

Jean, also known as "Nixon," and four co-defendants (Eric Bey, Kurt Campbell, Julnet Constontin, and Ludger Elibert), were indicted with conspiring to make and sell counterfeit currency, in violation of 18 U.S.C. §§ 471 and 473, from approximately June through 2 August 2001. R1-1 at 1-2. The evidence at trial established that Jean met with Ludger Elibert ("Elibert"), also known as "Rick," in Brooklyn, New York. R4 at 124, 128-29. Jean gave Elibert a sample of counterfeit currency and said, "This is what I do." Id. at 129. Jean also gave Elibert his home and cell phone numbers. Id. at 143-45. Elibert then returned to Georgia and sold the counterfeit money to a Russian electronics store owner named Igor Genut ("Genut") in July 2001. Id. at 68, 70, 129-30. Elibert told Genut that he could sell him as much counterfeit money as he wanted. Id. at 69.

That same month, Elibert returned to Brooklyn with co-defendant Eric Bey

2

("Bey"). Id. at 135-36. Bey sold his Mercedes Benz to Jean for approximately $60,000 to $70,000 counterfeit currency but did not give Jean the title to the car at that time. Id. at 136-39; R5 at 262, 264. Bey identified Jean at trial as the person who gave him the counterfeit money. R5 at 265-66.

Genut, who was cooperating with authorities, told Elibert he had a friend who wanted to buy counterfeit currency. R4 at 99. On 17 July 2001, Genut and undercover Secret Service agent Scott Donovan ("Donovan") met with Elibert, Bey, and co-defendant Julnet Constantin ("Junior"). Id. at 99-100. Donovan posed as a wealthy Russian businessman wanting to bring counterfeit currency back to Russia. Id. at 73, 98. At the meeting, Donovan bought $2000 counterfeit currency for $1000 genuine currency. Id. at 101. Elibert said the more Donovan bought, the better the price would be so long as their source in New York approved. Id. at 104.

On 19 July 2001, Donovan made a second purchase from Elibert and Bey of approximately $17,000 counterfeit currency for $6,500 genuine currency. Id. at 105-107. Genut also sold the co-defendants a DVD player and television in exchange for counterfeit money. Id. at 90-91, 117. During their negotiations for future purchases, Elibert and Bey mentioned that the printing of the counterfeit currency was being done in New York. Id. at 110.

3

A third and final transaction occurred on 2 August 2001, at which Elibert, Bey, Junior, and co-defendant Kurt Campbell were present. Id. at 111-12, 118. Donovan purchased $25,000 counterfeit currency for $10,000 genuine currency and agreed to purchase $500,000 in the future. Id. at 112, 118-19. All four co-defendants were then arrested at that time. Id. at 119.

Later that day, Jean called Elibert and instructed him to send the Mercedes Benz title to Wilson Jean at 50 Lenox Road, Apartment 1E, Brooklyn, New York, 11226. Id. at 145-47; Exh. Folder 1, Gov. Exh. 105B at 3. After authorities verified this was Jean's address, agents went there on 6 August 2001 to arrest him. R5 at 192. Jean's mother opened the door and said Jean had not come home last night. Id. at 192-93. Authorities advised her of their arrest warrant for Jean and asked to come in. Id. at 193. In plain view in the living room, agents saw counterfeit currency and numerous items used to make it. Id. at 193-95, 197. The serial numbers of the counterfeit currency matched those seized in Atlanta. Id. at 186, 213. A total of $176,950 counterfeit currency with identical serial numbers was detected throughout much of the United States during the summer of 2001. Id. at 181-82. A paper with the words "Rick" and "Atl" and different phone numbers for Elibert was also found in the Brooklyn apartment. R4 at 149-50; R5 at 207.

Jean moved for a directed verdict of acquittal after the government rested.

4

R5 at 228. The court denied the motion. Id. at 229. Jean testified at trial that he never met Elibert or Bey before and had no involvement in any counterfeit currency scheme. Id. at 281, 287. He claimed he moved out of the Lenox Road apartment in October 2000 but admitted keeping the apartment keys and having his mail sent there. Id. at 276, 278. After Jean presented evidence, and prior to closing argument, he renewed his motion for a judgment of acquittal, which the court again denied. R6 at 307. The jury found Jean guilty of the conspiracy count and the court sentenced him to forty months of imprisonment to be followed by three years of supervised release. R2-144, 151. This appeal followed.

## II. DISCUSSION

A. Motion to Suppress Evidence

Jean first argues that the district court erred in denying his motion to suppress evidence seized from the Brooklyn apartment because officers did not have a reasonable belief that Jean lived at that apartment and was present when they entered. Further, Jean argues that the agents had no permission to enter.

At a pre-trial hearing on Jean's motion to suppress, United States Secret Service Agent James Taylor testified that Elibert had advised agents his source of counterfeit currency was a person called "Nixon" who lived in New York. R3 at 12-13. After "Nixon" told Elibert to send the Mercedes Benz title to Wilson Jean

5

at the Brooklyn apartment, agents obtained a booking photograph of Jean taken on 22 May 2001, which also listed the same address. Id. at 19-20; Exh. Env. 2, Def. Exh. 1. Elibert had confirmed that "Nixon" was the same man in Jean's photograph. R3 at 20.

At approximately 6:00 A.M. on 6 August 2001, Secret Service agents went to the Brooklyn apartment to execute Jean's arrest warrant. Id. at 28, 41. According to the agents' report, Jean's mother, Ms. Jean, allowed them to come in after the agents identified themselves and explained they had a warrant for Jean's arrest. Id. at 28. Ms. Jean said her son lived there and she had expected him home the previous night. Id. at 29. Upon entering the apartment, agents saw in plain view in the living room counterfeit U.S. Federal Reserve notes on paper in a printer, paraphernalia used to make counterfeit currency, and open trash bags with discarded printings of federal reserve notes. Id.

In contrast to the agents' report, Ms. Jean testified that the agents entered her apartment without her permission. Id. at 46-47, 49. She initially testified that the agents did not ask her any questions. Id. at 47-49. On cross-examination, Ms. Jean admitted the agents *did* ask about her son and she told them he did not live there. Id. at 57. Ms. Jean claimed a man named "Jerry Nixon" lived in her apartment and that she did not remember any bags of counterfeit money or a copier machine

6

being in her living room.  Id. at 54-55.  Ms. Jean confirmed that her apartment's phone number was 718-856-7593.  Id. at 61.  This was the same number Elibert had stored in his cell phone as Nixon's home phone number.  Id. at 15.

The magistrate judge recommended that Jean's motion to suppress evidence be denied.  R1-122 at 1.  The magistrate judge concluded that the facts of the case were more than sufficient to support a reasonable belief that Nixon and Jean were the same person, that Jean lived at the Brooklyn apartment, and that agents could have reasonably presumed that Jean would be home at 6:00 A.M.  Id. at 6-7.  The magistrate judge discredited Ms. Jean's testimony based on her contradictory and evasive responses to questions about her son and the incriminating items in her apartment.  Id. at 8.  Additionally, the magistrate judge concluded that the agents could have believed that Ms. Jean was attempting to protect her son and thus "could have reasonably chosen not to believe her in light of the strong evidence they possessed indicating that [Jean] did live in the apartment."  Id.  Finally, the magistrate judge found that the incriminating items seized were in plain view in the living room.  Id.  The district court adopted the magistrate judge's report and recommendation.  R1-132 at 4-5.

We review the district court's legal conclusions de novo and its factual findings for clear error.  See United States v. Bervaldi, 226 F.3d 1256, 1262 (11th

Cir. 2000).  All facts are construed in the government's favor.  See id.  Where there is conflicting testimony, we defer to a magistrate judge's credibility determinations "unless [the judge's] understanding of the facts appears to be unbelievable." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (quotation marks and citation omitted).

An arrest warrant gives law enforcement officers "'limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'"  Bervaldi, 226 F.3d at 1263 (quoting Payton v. New York, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388 (1980)).  An entry pursuant to an arrest warrant satisfies the Fourth Amendment if the officers reasonably believe the suspect lives at the dwelling and is inside at the time of entry.  See id.  Courts must apply common sense and evaluate all the facts and circumstances known to the agents in determining whether a reasonable belief exists.  See id.

The record supports the district court's conclusion that the agents had a reasonable belief that Jean lived at the Brooklyn apartment.  As found by the magistrate judge and district court, "Nixon" gave the name Wilson Jean and the Brooklyn address to Elibert so that "Nixon" could obtain the title to the Mercedes Benz he had received in exchange for counterfeit money.  Elibert then identified "Nixon" from a booking photograph of Jean taken less than three months before

8

the search at the apartment. Further, the home phone number Elibert had for Nixon was the same number for the Brooklyn apartment. These facts sufficiently supported the agents' reasonable belief that Jean lived at that address.

The district court also correctly concluded that the agents had a reasonable belief that Jean was inside the apartment when they entered. We have previously held in Bervaldi that, in the absence of contrary evidence, officers may reasonably presume a suspect is at his residence at 6:00 A.M. and enter pursuant to an arrest warrant. See id. at 1267 (presumption that a person is home at certain times of the day may be rebutted with evidence about the suspect's schedule). As in Bervaldi, there was no contrary evidence about Jean's schedule to rebut the presumption that he would be home at 6:00 A.M. Although Jean's mother testified that she told the agents her son was not there, the magistrate judge discredited her testimony based on her conflicting statements and evasive responses. The magistrate judge's evaluation of the facts is not "unbelievable" and her credibility determinations are thus entitled to deference. See Ramirez-Chilel, 289 F.3d at 749 (quotation marks and citation omitted).

Because the entry was permitted under Payton, the seizure of the evidence in plain view was also permissible. See United States v. Rodgers, 924 F.2d 219, 221 (11th Cir. 1991) ("The plain view doctrine allows police officers to seize any

9

contraband in plain view if the officers have a right of access to the place where the contraband is located."). Accordingly, the district court did not err in denying Jean's motion to suppress evidence seized from the Brooklyn apartment.

B. In-Court Identification

Jean next contends that the district court erred in permitting Elibert to identify him in court because that identification was impermissibly tainted by Elibert's out-of-court identification based on Jean's single booking photograph. The government responds that Elibert's in-court identification was reliable under the totality of the circumstances and that the district court correctly found that a sufficient basis had been laid for Elibert to identify Jean in court without reference to the booking photograph. The government also argues that any error would be harmless in light of Bey's trial identification of Jean.

Prior to trial, Jean moved to suppress Elibert's out-of-court identification of Jean and any in-court identification tainted by out-of-court error. R1-95. Following the pre-trial hearing on Jean's motion to suppress, the magistrate judge concluded that because Elibert was only shown one photograph of Jean (the May 2001 booking photograph), the pre-trial identification procedure was unduly suggestive. R1-122 at 10. Nevertheless, the magistrate judge found "a strong indication that Elibert's identification of [Jean] would be reliable and that the

10

suggestive pre-trial procedure did not create a substantial risk of misidentification."
Id. at 11. The magistrate judge ultimately deferred ruling on the issue to the trial court to evaluate the totality of the circumstances based on the evidence presented at trial. Id. The district court agreed and took under advisement the motion to suppress identification. R1-132 at 5.

Elibert testified at trial that both he and Jean are Haitian. R4 at 125, 127, 131. Before moving to Atlanta, Elibert previously worked in a barbershop in Brooklyn which Jean frequented. Id. at 125-26. During a trip to New York, a mutual friend named Nikko reintroduced Jean to Elibert, at which time Elibert received a sample of counterfeit currency from Jean. Id. at 127-29. Elibert testified that, in 2001, Jean was heavy set, wore his hair in braids, had slightly darker skin than him, and was about 5'8" or 5'9" tall. Id. at 131-32. This was the same physical description that Elibert had given the agents in August 2001. R5 at 162-63. Elibert also testified at trial that he was born in 1970 and Jean was slightly younger than him. R4 at 126. In a side bar conference, the district court ruled that a sufficient basis had been laid for Elibert to identify Jean without reference to Jean's booking photograph and denied Jean's motion to suppress. Id. at 134. Elibert then identified Jean in court as the person with whom he conducted the 2001 transactions. Id. at 134-35. On cross-examination, the defense introduced

11

into evidence Jean's May 2001 booking photograph and questioned Elibert about it. R5 at 158. Elibert testified that he did not remember previously identifying Jean from his booking photograph, however. Id. Elibert said he always mistakenly called Jean "Nixon" instead of Wilson. Id. at 164.

An in-court identification violates due process if: (1) "the original identification procedure was unduly suggestive;" and (2) "the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial." Marsden v. Moore, 847 F.2d 1536, 1545 (11th Cir. 1988). The district court's conclusion in this case that the photo identification procedure was unduly suggestive is subject to clear error review. See United States v. Diaz, 248 F.3d 1065, 1103 (11th Cir. 2001). In this case, the district court did not clearly err in determining that showing Elibert only one photograph of Jean was unduly suggestive. See Manson v. Brathwaite, 432 U.S. 98, 109, 97 S. Ct. 2243, 2250 (1977) (single photograph of defendant suggestive and unnecessary); accord United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984); United States v. Cueto, 611 F.2d 1056, 1064 (5th Cir. 1980).

Nevertheless, an in-court identification based on an independent source may be admissible despite a suggestive out-of-court identification procedure. See Marsden, 847 F.2d at 1546; Cannington, 729 F.2d at 711. In determining whether

12

Elibert's in-court identification had a reliable, independent basis, we must consider all the circumstances, including Elibert's opportunity to view Jean at the time of the offense, Elibert's degree of attention at that time, the accuracy of Elibert's prior description of Jean, Elibert's level of certainty when identifying Jean at trial, and the length of time between their prior meetings and the trial identification. See Marsden, 847 F.2d at 1546. Even if the in-court identification is found to be unreliable, any constitutional error is subject to harmless error analysis. See id.

Applying these factors, we conclude that Elibert's in-court identification was reliable. Elibert met Jean face-to-face on at least two occasions, when Jean gave him a sample of the counterfeit currency and when Jean traded counterfeit currency in exchange for Bey's Mercedes. Elibert spoke with Jean on both occasions and there is no evidence he was not attentive. The May 2001 booking photograph of Jean shows that he has dark skin, is six feet tall, weighs 190 lbs, and was born in 1974. Exh. Env. 2, Def. Exh. 1. His hair also appears to be in tight braids. Id.; Exh. Folder 1, Gov. Exh. 516. Elibert's description of Jean in August 2001 is thus fairly accurate. Although several years passed between the confrontations in 2001 and the trial in 2007, Elibert showed no hesitation in identifying Jean at trial. In addition, Elibert testified on cross-examination that he did not remember seeing Jean's booking photograph or identifying Jean from the photograph. Thus, the

13

booking photograph had minimal, if any, effect on Elibert's trial identification.

Jean points out that Elibert failed to identify Jean from two other photo line-ups before trial, Elibert did not tell agents about Jean's tattoos or broken front tooth, and Elibert knew where a defendant sits in a courtroom. These arguments were raised during Elibert's cross-examination at trial, however, and were merely "grist for the jury mill." O'Brien v. Wainwright, 738 F.2d 1139, 1143 (11th Cir. 1984) (quotation marks and citation omitted). When viewed in light of all the circumstances, Elibert's in-court identification had a reliable and sufficient basis independent of the booking photograph. See Cannington, 729 F.2d at 711 (in-court identifications admissible despite single photograph display where witnesses observed defendant at close range on several occasions); O'Brien, 738 F.2d at 1141-42 (in-court identification reliable despite unduly suggestive photographic lineup where witness had a clear view of the defendant, never identified anyone but the defendant, and his identifications were made with certainty except when the defendant disguised himself with a beard). Accordingly, the district court did not err in denying Jean's motion to suppress and in admitting Elibert's in-court identification.

C. Sufficiency of the Evidence

Jean submits that the evidence showed nothing more than a one-time deal to

trade an automobile for counterfeit currency. He contends this was a "buyer-seller" relationship, rather than a conspiracy to make and sell counterfeit currency. Jean further argues there is no evidence that he knew of any agreement between his co-defendants to sell counterfeit currency. Because there was no joint criminal objective, Jean contends the district court erred in denying his motion for a judgment of acquittal on the conspiracy count.

We review de novo the district court's denial of Jean's motion for judgment of acquittal. See United States v. Yates, 438 F.3d 1307, 1311-12 (11th Cir. 2006) (en banc). We must affirm Jean's conviction if the jury could have found him guilty beyond a reasonable doubt under any reasonable construction of the evidence. See United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005) (per curiam). All reasonable inferences and credibility choices are drawn in the government's favor. See id.

To prove Jean participated in a conspiracy, the government had to show that he made an agreement with one or more persons to make and sell counterfeit currency, and that he knowingly and voluntarily joined this agreement. See id. The government need *not* prove that Jean knew every detail, each conspirator, or participated in all aspects of the conspiracy. See id. at 1270; United States v. Solomon, 686 F.2d 863, 869 (11th Cir. 1982). Instead, Jean need only know the

15

conspiracy's essential nature, proof of which may be shown by direct or circumstantial evidence. See Garcia, 405 F.3d at 1269-70. What distinguishes conspiracy from its underlying offense is an agreement with a joint criminal objective beyond that of the immediate transaction. See United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999) (per curiam). "Where the buyer's purpose is merely to buy and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown." Id. (quotation marks and citations omitted).

In this case, there was sufficient evidence of a prior and an ongoing understanding between Jean and his co-conspirators to make and sell counterfeit currency beyond the sale of the Mercedes Benz. The evidence showed that Jean met Elibert in New York, told him "this is what I do," and gave him a sample of the counterfeit currency he made. Jean gave Elibert multiple telephone numbers to reach him, and Elibert's phone numbers were found in the Brooklyn apartment to which Jean had access. Their exchange of phone numbers indicates a desire for an ongoing relationship. Elibert sold the sample currency to a buyer and then went back to Brooklyn with Bey to buy more counterfeit currency in exchange for Bey's Mercedes Benz. During Elibert's negotiations with Donovan, Elibert said that with

16

enough front money and lead time, his source in New York could make as much counterfeit money as Donovan wanted. R4 at 122. Donovan's agreement at the last transaction to purchase $500,000 of counterfeit currency in the future supports an inference that Elibert planned to obtain more counterfeit money from Jean. The fact that Jean was supplying Elibert with large sums of counterfeit currency for distribution is supported by the evidence of manufacturing equipment and counterfeit currency seized from the New York address which Jean gave to Elibert. The serial numbers of this counterfeit currency were found disbursed throughout the United States.

This evidence, viewed in the light most favorable to the government, supports the jury's conclusion beyond a reasonable doubt that Jean participated in a knowing agreement with others to make or counterfeit United States currency and to broker sales of that currency. Even if Jean was not necessarily involved in all of his co-conspirators' transactions, the evidence showed that Jean's participation extended beyond a one-time buy-sell deal. A jury could reasonably have inferred that Jean had an agreement to participate in a joint criminal objective, namely Jean's supplying Elibert and his co-conspirators with as much counterfeit currency as they could sell. Accordingly, the evidence was sufficient to support Jean's conviction for conspiracy as charged.

17

### III. CONCLUSION

Wilson Jean appeals his conviction for conspiracy to make and sell counterfeit currency. We conclude that the district court correctly admitted evidence seized in plain view from a Brooklyn apartment in August 2001 because the agents had a reasonable belief that Jean lived at that apartment and was inside at the time of their entry. Elibert's in-court identification of Jean was also admissible because Elibert could reliably identify Jean independent of his prior out-of-court identification. Finally, the evidence demonstrated that Jean participated in an ongoing, criminal conspiracy as opposed to a mere one-time transaction. Jean's conviction and sentence are AFFIRMED.